(Slip Opinion) OCTOBER TERM, 2010 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## SOSSAMON *v.* TEXAS ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 08–1438. Argued November 2, 2010—Decided April 20, 2011

After this Court held that the Religious Freedom Restoration Act of 1993 was unconstitutional as applied to state and local governments because it exceeded Congress' power under §5 of the Fourteenth Amendment, see *City of Boerne* v. *Flores*, 521 U. S. 507, Congress passed the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA) pursuant to its Spending Clause and Commerce Clause authority. RLUIPA targets two areas of state and local action: land–use regulation, RLUIPA §2, 42 U. S. C. §2000cc, and restrictions on the religious exercise of institutionalized persons, RLUIPA §3, §2000cc–1. It also provides an express private cause of action for "appropriate relief against a government," §2000cc–2(a), including, *inter alia*, States, their instrumentalities and officers, and persons acting under color of state law, §2000cc–5(4)(A).

Petitioner Sossamon, a Texas prison inmate, sued respondents, the State and prison officials, seeking injunctive and monetary relief under RLUIPA for prison policies that prevented inmates from attending religious services while on cell restriction for disciplinary infractions and that barred use of the prison chapel for religious worship. Granting respondents summary judgment, the District Court held that sovereign immunity barred Sossamon's claims for monetary relief. The Fifth Circuit affirmed, holding that the statutory phrase "appropriate relief against a government" did not unambiguously notify Texas that its acceptance of federal funds was conditioned on a waiver of sovereign immunity to claims for monetary relief.

*Held:* States, in accepting federal funding, do not consent to waive their sovereign immunity to private suits for money damages under RLUIPA. Pp. 4–14.

(a) Sovereign immunity principles enforce an important constitu-

tional limitation on the power of the federal courts. See *Pennhurst State School and Hospital* v. *Halderman*, 465 U. S. 89, 98. This Court has consistently made clear that "federal jurisdiction over suits against unconsenting States 'was not contemplated by the Constitution when establishing the judicial power of the United States.'" *Seminole Tribe of Fla.* v. *Florida*, 517 U. S. 44, 54. A State, however, may choose to waive its immunity. *Clark* v. *Barnard*, 108 U. S. 436, 447–448. The "'test for determining whether [it has done so] is a stringent one.'" *College Savings Bank* v. *Florida Prepaid Postsecondary Ed. Expense Bd.*, 527 U. S. 666, 675. The State's consent to suit must be "unequivocally expressed" in the relevant statute's text. *Pennhurst*, *supra*, at 99. A waiver "will be strictly construed, in terms of its scope, in favor of the sovereign." *Lane* v. *Peña*, 518 U. S. 187, 192. Pp. 4–6.

(b) RLUIPA's authorization of "appropriate relief against a government," is not an unequivocal expression of state consent. Pp. 6–10.

(1) "Appropriate relief" is open-ended and ambiguous about the relief it includes. "Appropriate" is inherently context-dependent. And the context here—where the defendant is a sovereign—suggests, if anything, that monetary damages are not "suitable" or "proper." See *Federal Maritime Comm'n* v. *South Carolina Ports Authority*, 535 U. S. 743, 765. Further, where a statute is susceptible of multiple plausible interpretations, including one preserving immunity, this Court will not consider a State to have waived its sovereign immunity. Sossamon's and Texas' conflicting plausible arguments about whether immunity is preserved here demonstrate that "appropriate relief" in RLUIPA is not so free from ambiguity that the Court may conclude that the States, by receiving federal funds, have unequivocally expressed intent to waive their immunity. Pp. 6–9.

(2) The Court's use of the phrase "appropriate relief" in *Franklin* v. *Gwinnett County Public Schools*, 503 U. S. 60, and *Barnes* v. *Gorman*, 536 U. S. 181, does not compel a contrary conclusion. In those cases, where there was no express congressional intent to limit remedies available against municipal entities under an implied right of action, the Court presumed that compensatory damages were available. *Franklin*, *supra*, at 73. But that presumption is irrelevant to construing the scope of an express waiver of sovereign immunity, where the question is not whether Congress has given clear direction that it intends to exclude a damages remedy, but whether it has given clear direction that it intends to include a damages remedy. Pp. 9–10.

(c) Sossamon mistakenly contends that Congress' enactment of RLUIPA §3 pursuant to the Spending Clause put the States on notice

that they would be liable for damages because Spending Clause legislation operates as a contract and damages are always available for a breach of contract. While acknowledging the contract-law analogy, this Court has been clear "not [to] imply . . . that suits under Spending Clause legislation are suits in contract, or that contract-law principles apply to all issues that they raise," *Barnes, supra*, at 188, n. 2, or to rely on that analogy to expand liability beyond what would exist under nonspending statutes, much less to extend monetary liability against the States. Applying ordinary contract principles here would also make little sense because contracts with a sovereign are unique: They do not traditionally confer a right of action for damages to enforce compliance. More fundamentally, Sossamon's implied-contract remedy cannot be squared with the rule that a sovereign immunity waiver must be expressly and unequivocally stated in the relevant statute's text. Pp. 10–12.

   (d) Sossamon also errs in arguing that Texas was put on notice that it could be sued for damages under RLUIPA by §1003 of the Rehabilitation Act Amendments of 1986, which expressly waives state sovereign immunity for violations of "section 504 of the Rehabilitation Act of 1973, title IX of the Education Amendments of 1972, the Age Discrimination Act of 1975, title VI of the Civil Rights Act of 1964, or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance," 42 U. S. C. §2000d–7. Even if such a residual clause could constitute an unequivocal textual waiver, RLUIPA §3—which prohibits "substantial burden[s]" on religious exercise—is not unequivocally a "statute prohibiting discrimination" within §1003's meaning. All the statutory provisions enumerated in §1003 explicitly prohibit discrimination; a State might reasonably conclude that the residual clause, strictly construed, covers only provisions using the term "discrimination." Pp. 12–14.

560 F. 3d 316, affirmed.

   THOMAS, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, KENNEDY, GINSBURG, and ALITO, JJ., joined. SOTOMAYOR, J., filed a dissenting opinion, in which BREYER, J., joined. KAGAN, J., took no part in the consideration or decision of the case.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 08–1438

## HARVEY LEROY SOSSAMON, III, PETITIONER *v.* TEXAS ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[April 20, 2011]

JUSTICE THOMAS delivered the opinion of the Court.

This case presents the question whether the States, by accepting federal funds, consent to waive their sovereign immunity to suits for money damages under the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 114 Stat. 803, 42 U. S. C. §2000cc *et seq.* We hold that they do not. Sovereign immunity therefore bars this suit for damages against the State of Texas.

I

A

RLUIPA is Congress' second attempt to accord heightened statutory protection to religious exercise in the wake of this Court's decision in *Employment Division, Department of Human Resources of Oregon* v. *Smith*, 494 U. S. 872 (1990). Congress first enacted the Religious Freedom Restoration Act of 1993 (RFRA), 107 Stat. 1488, 42 U. S. C. §2000bb *et seq.*, with which it intended to "restore the compelling interest test as set forth in *Sherbert* v. *Verner*, 374 U. S. 398 (1963) and *Wisconsin* v. *Yoder*, 406 U. S. 205 (1972) . . . in all cases where free exercise of religion is substantially burdened." §2000bb(b)(1). See

generally *Gonzales* v. *O Centro Espírita Beneficente União do Vegetal*, 546 U. S. 418, 424 (2006). We held RFRA unconstitutional as applied to state and local governments because it exceeded Congress' power under §5 of the Fourteenth Amendment. See *City of Boerne* v. *Flores*, 521 U. S. 507 (1997).

Congress responded by enacting RLUIPA pursuant to its Spending Clause and Commerce Clause authority. RLUIPA borrows important elements from RFRA—which continues to apply to the Federal Government—but RLUIPA is less sweeping in scope. See *Cutter* v. *Wilkinson*, 544 U. S. 709, 715 (2005). It targets two areas of state and local action: land-use regulation, 42 U. S. C. §2000cc (RLUIPA §2), and restrictions on the religious exercise of institutionalized persons, §2000cc–1 (RLUIPA §3).

Section 3 of RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise" of an institutionalized person unless, as in RFRA, the government demonstrates that the burden "is in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering" that interest. §2000cc–1(a); cf. §§2000bb–1(a), (b). As relevant here, §3 applies "in any case" in which "the substantial burden is imposed in a program or activity that receives Federal financial assistance."[1] §2000cc–1(b)(1).

RLUIPA also includes an express private cause of action that is taken from RFRA: "A person may assert a violation of [RLUIPA] as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." §2000cc–2(a); cf. §2000bb–1(c). For purposes of this provi-

------

[1] No party contends that the Commerce Clause permitted Congress to address the alleged burden on religious exercise at issue in this case. See 42 U. S. C. §2000cc–1(b)(2). Nor is Congress' authority to enact RLUIPA under the Spending Clause challenged here. We therefore do not address those issues.

sion, "government" includes, *inter alia*, States, counties, municipalities, their instrumentalities and officers, and persons acting under color of state law. §2000cc–5(4)(A).

B

Petitioner Harvey Leroy Sossamon III is an inmate in the Robertson Unit of the Texas Department of Criminal Justice, Correctional Institutions Division. In 2006, Sossamon sued the State of Texas and various prison officials in their official capacities under RLUIPA's private cause of action, seeking injunctive and monetary relief. Sossamon alleged that two prison policies violated RLUIPA: (1) a policy preventing inmates from attending religious services while on cell restriction for disciplinary infractions; and (2) a policy barring use of the prison chapel for religious worship. The District Court granted summary judgment in favor of respondents and held, as relevant here, that sovereign immunity barred Sossamon's claims for monetary relief.[2] See 713 F. Supp. 2d 657, 662–663 (WD Tex. 2007).

The Court of Appeals for the Fifth Circuit affirmed. 560 F. 3d 316, 329 (2009). Acknowledging that Congress enacted RLUIPA pursuant to the Spending Clause, the court determined that Texas had not waived its sovereign immunity by accepting federal funds. The Court of Appeals strictly construed the text of RLUIPA's cause of action in favor of the State and concluded that the statu-

———————

[2] The District Court also denied injunctive relief. 713 F. Supp. 2d 657, 668 (WD Tex. 2007). The Court of Appeals subsequently held that Sossamon's claim for injunctive relief with respect to the cell-restriction policy was moot because the State had abandoned that policy after Sossamon filed a prison grievance. 560 F. 3d 316, 326 (CA5 2009). The Court of Appeals reversed the District Court with respect to Sossamon's chapel-use policy claim, *id.,* at 331–335, although the Robertson Unit later amended that policy also and now permits inmates to attend scheduled worship services in the chapel subject to certain safety precautions.

tory phrase "appropriate relief against a government" did not "unambiguously notif[y]" Texas that its acceptance of funds was conditioned on a waiver of immunity from claims for money damages. *Id.*, at 330–331. We granted certiorari to resolve a division of authority among the courts of appeals on this question.[3] 560 U. S. ___ (2010).

## II

"Dual sovereignty is a defining feature of our Nation's constitutional blueprint." *Federal Maritime Comm'n* v. *South Carolina Ports Authority*, 535 U. S. 743, 751 (2002). Upon ratification of the Constitution, the States entered the Union "with their sovereignty intact." *Ibid.* (internal quotation marks omitted).

Immunity from private suits has long been considered "central to sovereign dignity." *Alden* v. *Maine*, 527 U. S. 706, 715 (1999). As was widely understood at the time the Constitution was drafted:

> "It is inherent in the nature of sovereignty not to be amenable to the suit of an individual *without its consent*. This is the general sense, and the general practice of mankind; and the exemption, as one of the attributes of sovereignty, is now enjoyed by the government of every State in the Union." The Federalist No. 81, p. 511 (Wright ed. 1961) (A. Hamilton).

Indeed, when this Court threatened state immunity from private suits early in our Nation's history, the people responded swiftly to reiterate that fundamental principle. See *Hans* v. *Louisiana*, 134 U. S. 1, 11 (1890) (discussing

--------

[3] Compare *Madison* v. *Virginia*, 474 F. 3d 118, 131 (CA4 2006); 560 F. 3d, at 331 (case below); *Cardinal* v. *Metrish*, 564 F. 3d 794, 801 (CA6 2009); *Nelson* v. *Miller*, 570 F. 3d 868, 885 (CA7 2009); *Van Wyhe* v. *Reisch*, 581 F. 3d 639, 655 (CA8 2009); and *Holley* v. *California Dept. of Corrections*, 599 F. 3d 1108, 1112 (CA9 2010), with *Smith* v. *Allen*, 502 F. 3d 1255, 1276, n. 12 (CA11 2007) (citing *Benning* v. *Georgia*, 391 F. 3d 1299, 1305–1306 (CA11 2004)).

*Chisholm* v. *Georgia*, 2 Dall. 419 (1793), and the Eleventh Amendment).

Sovereign immunity principles enforce an important constitutional limitation on the power of the federal courts. See *Pennhurst State School and Hospital* v. *Halderman*, 465 U. S. 89, 98 (1984). For over a century now, this Court has consistently made clear that "federal jurisdiction over suits against unconsenting States 'was not contemplated by the Constitution when establishing the judicial power of the United States.'" *Seminole Tribe of Fla.* v. *Florida*, 517 U. S. 44, 54 (1996) (quoting *Hans*, *supra,* at 15); see *Seminole Tribe*, *supra*, at 54–55, n. 7 (collecting cases). A State, however, may choose to waive its immunity in federal court at its pleasure. *Clark* v. *Barnard*, 108 U. S. 436, 447–448 (1883).

Accordingly, "our test for determining whether a State has waived its immunity from federal-court jurisdiction is a stringent one." *College Savings Bank* v. *Florida Prepaid Postsecondary Ed. Expense Bd.*, 527 U. S. 666, 675 (1999) (internal quotation marks omitted). A State's consent to suit must be "unequivocally expressed" in the text of the relevant statute. *Pennhurst State School and Hospital*, *supra*, at 99; see *Atascadero State Hospital* v. *Scanlon*, 473 U. S. 234, 238, n. 1, 239–240 (1985). Only by requiring this "clear declaration" by the State can we be "certain that the State in fact consents to suit." *College Savings Bank*, 527 U. S., at 680. Waiver may not be implied. *Id.,* at 682.

For these reasons, a waiver of sovereign immunity "will be strictly construed, in terms of its scope, in favor of the sovereign." *Lane* v. *Peña*, 518 U. S. 187, 192 (1996).[4] So,

––––––––––

[4] Although *Lane* concerned the Federal Government, the strict construction principle, which flows logically from the requirement that consent be "unequivocally expressed," applies to the sovereign immunity of the States as well. Cf. *United States* v. *Nordic Village, Inc.*, 503 U. S. 30, 37 (1992) (equating the "unequivocal expression" principle

for example, a State's consent to suit in its own courts is not a waiver of its immunity from suit in federal court. *College Savings Bank*, *supra*, at 676. Similarly, a waiver of sovereign immunity to other types of relief does not waive immunity to damages: "[T]he waiver of sovereign immunity must extend unambiguously to such monetary claims." *Lane*, *supra*, at 192; cf. *United States* v. *Nordic Village*, 503 U. S. 30, 34 (1992) (construing an ambiguous waiver of sovereign immunity to permit equitable but not monetary claims); *Hoffman* v. *Connecticut Dept. of Income Maintenance*, 492 U. S. 96, 101–102 (1989) (construing a statute to authorize injunctive relief but not "monetary recovery from the States" because intent to abrogate immunity to monetary recovery was not "'unmistakably clear in the language of the statute'" (quoting *Atascadero*, *supra*, at 242)).

### III
### A

RLUIPA's authorization of "appropriate relief against a government," §2000cc–2(a), is not the unequivocal expression of state consent that our precedents require. "Appropriate relief" does not so clearly and unambiguously waive sovereign immunity to private suits for damages that we can "be certain that the State in fact consents" to such a suit. *College Savings Bank*, 527 U. S., at 680.

### 1

"Appropriate relief" is open-ended and ambiguous about what types of relief it includes, as many lower courts have

———————

from "the Eleventh Amendment context" with the principle applicable to federal sovereign immunity); *College Savings Bank* v. *Florida Prepaid Postsecondary Ed. Expense Bd.*, 527 U. S. 666, 682 (1999) (noting the "clos[e] analogy" between federal and state sovereign immunity); *Belknap* v. *Schild*, 161 U. S. 10, 18 (1896) ("[A] State . . . is as exempt as the United States [is] from private suit").

recognized. See, *e.g.*, 560 F. 3d, at 330–331.[5] Far from clearly identifying money damages, the word "appropriate" is inherently context-dependent. See Webster's Third New International Dictionary 106 (1993) (defining "appropriate" as "specially suitable: FIT, PROPER"). The context here—where the defendant is a sovereign—suggests, if anything, that monetary damages are not "suitable" or "proper." See *Federal Maritime Comm'n*, 535 U. S*.,* at 765 ("[S]tate sovereign immunity serves the important function of shielding state treasuries . . .").

Indeed, both the Court and dissent appeared to agree in *West* v. *Gibson*, 527 U. S. 212 (1999), that "appropriate" relief, by itself, does not unambiguously include damages against a sovereign. The question was whether the Equal Employment Opportunity Commission, which has authority to enforce Title VII of the Civil Rights Act against the Federal Government "through appropriate remedies," could require the Federal Government to pay damages. 42 U. S. C. §2000e–16(b). The dissent argued that the phrase "appropriate remedies" did not authorize damages "in express and unequivocal terms." *Gibson*, 527 U. S., at 226 (opinion of KENNEDY, J.). The Court apparently did not disagree but reasoned that "appropriate remedies" had a flexible meaning that had expanded to include money damages after a related statute was amended to explicitly allow damages in actions under Title VII. See *id.*, at 217–218.

Further, where a statute is susceptible of multiple plausible interpretations, including one preserving immunity, we will not consider a State to have waived its sovereign immunity. See *Dellmuth* v. *Muth*, 491 U. S. 223, 232

---

[5] See also *Holley, supra*, at 1112; *Nelson, supra*, at 884; *Van Wyhe, supra*, at 654; *Cardinal, supra*, at 801; *Madison, supra*, at 131–132; cf. *Webman* v. *Federal Bur. of Prisons*, 441 F. 3d 1022, 1023 (CADC 2006) (interpreting the "appropriate relief" provision of RFRA).

(1989) (holding that "a permissible inference" is not the necessary "unequivocal declaration" that States were intended to be subject to damages actions); *Nordic Village, supra*, at 37 (holding that the existence of "plausible" interpretations that would not permit recovery "is enough to establish that a reading imposing monetary liability on the Government is not 'unambiguous' and therefore should not be adopted"). That is the case here.

Sossamon argues that, because RLUIPA expressly limits the United States to "injunctive or declaratory relief" to enforce the statute, the phrase "appropriate relief" in the private cause of action necessarily must be broader. 42 U. S. C. §2000cc–2(f). Texas responds that, because the State has no immunity defense to a suit brought by the Federal Government, Congress needed to exclude damages affirmatively in that context but not in the context of private suits. Further, the private cause of action provides that a person may assert a violation of the statute "as a claim *or defense.*" §2000cc–2(a) (emphasis added). Because an injunction or declaratory judgment is not "appropriate relief" for a successful defense, Texas explains, explicitly limiting the private cause of action to those forms of relief would make no sense.

Sossamon also emphasizes that the statute requires that it be "construed in favor of a broad protection of religious exercise." §2000cc–3(g). Texas responds that this provision is best read as addressing the substantive standards in the statute, not the scope of "appropriate relief." Texas also highlights Congress' choice of the word "relief," which it argues primarily connotes equitable relief. See Black's Law Dictionary 1295 (7th ed. 1999) (defining "relief" as "[t]he redress or benefit, esp. equitable in nature . . . , that a party asks of a court").

These plausible arguments demonstrate that the phrase "appropriate relief" in RLUIPA is not so free from ambiguity that we may conclude that the States, by receiving

federal funds, have unequivocally expressed intent to waive their sovereign immunity to suits for damages. Strictly construing that phrase in favor of the sovereign—as we must, see *Lane*, 518 U. S., at 192—we conclude that it does not include suits for damages against a State.

2

The Court's use of the phrase "appropriate relief" in *Franklin* v. *Gwinnett County Public Schools*, 503 U. S. 60 (1992), and *Barnes* v. *Gorman*, 536 U. S. 181 (2002), does not compel a contrary conclusion. In those cases, the Court addressed what remedies are available against municipal entities under the *implied* right of action to enforce Title IX of the Education Amendments of 1972, §202 of the Americans with Disabilities Act of 1990, and §504 of the Rehabilitation Act of 1973. With no statutory text to interpret, the Court "presume[d] the availability of all appropriate remedies unless Congress ha[d] expressly indicated otherwise." *Franklin*, 503 U. S., at 66. The Court described the presumption as "[t]he general rule" that "the federal courts have the power to award any *appropriate relief* in a cognizable cause of action brought pursuant to a federal statute." *Id.*, at 70–71 (emphasis added); see *Barnes*, *supra*, at 185 (quoting *Franklin*, *supra*, at 73). Finding no express congressional intent to limit the remedies available under the implied right of action, the Court held that compensatory damages were available. *Franklin*, *supra*, at 73.

The presumption in *Franklin* and *Barnes* is irrelevant to construing the scope of an express waiver of sovereign immunity. See *Lane*, *supra*, at 196 ("[R]eliance on *Franklin* . . . is misplaced" in determining whether damages are available against the Federal Government). The question here is not whether Congress has given clear direction that it intends to *exclude* a damages remedy, see *Franklin*, *supra*, at 70–71, but whether Congress has given clear

direction that it intends to *include* a damages remedy. The text must "establish unambiguously that the waiver extends to monetary claims." *Nordic Village*, 503 U. S., at 34. In *Franklin* and *Barnes*, congressional silence had an entirely different implication than it does here. Whatever "appropriate relief" might have meant in those cases does not translate to this context.[6]

### B

Sossamon contends that, because Congress enacted §3 of RLUIPA pursuant to the Spending Clause, the States were necessarily on notice that they would be liable for damages. He argues that Spending Clause legislation operates as a contract and damages are always available relief for a breach of contract, whether the contract explicitly includes a damages remedy or not. Relying on *Barnes* and *Franklin*, he asserts that all recipients of federal funding are "'generally on notice that [they are] subject . . . to those remedies traditionally available in suits for breach of contract,'" including compensatory damages. Brief for Petitioner 27 (quoting *Barnes*, 536 U. S., at 187).

We have acknowledged the contract-law analogy, but we have been clear "not [to] imply . . . that suits under Spending Clause legislation are suits in contract, or that

_____

[6] Nor can it be said that this Court's use of the phrase "appropriate relief" in *Franklin* and *Barnes* somehow put the States on notice that the same phrase in RLUIPA subjected them to suits for monetary relief. Those cases did not involve sovereign defendants, so the Court had no occasion to consider sovereign immunity. Liability against nonsovereigns could not put the States on notice that they would be liable in the same manner, absent an unequivocal textual waiver. Moreover, the same phrase in RFRA had been interpreted not to include damages relief against the Federal Government or the States and so could have signaled to the States that damages are *not* "appropriate relief" under RLUIPA. See, *e.g., Tinsley* v. *Pittari*, 952 F. Supp. 384, 389 (ND Tex. 1996); *Commack Self-Service Kosher Meats Inc.* v. *New York*, 954 F. Supp. 65, 69 (EDNY 1997).

contract-law principles apply to all issues that they raise." *Barnes*, *supra*, at 189, n. 2. We have not relied on the Spending Clause contract analogy to expand liability beyond what would exist under non-spending statutes, much less to extend monetary liability against the States, as Sossamon would have us do. In fact, in *Barnes* and *Franklin*, the Court discussed the Spending Clause context only as a potential *limitation* on liability. See *Barnes*, *supra,* at 187–188; *Franklin*, *supra*, at 74–75.

In any event, applying ordinary contract principles here would make little sense because contracts with a sovereign are unique. They do not traditionally confer a right of action for damages to enforce compliance: "'The contracts between a Nation and an individual are only binding on the conscience of the sovereign and have no pretensions to compulsive force. They confer no right of action independent of the sovereign will.'" *Lynch* v. *United States*, 292 U. S. 571, 580–581 (1934) (quoting The Federalist, No. 81, at 511 (A. Hamilton)).[7]

More fundamentally, Sossamon's implied-contract-remedies proposal cannot be squared with our longstanding rule that a waiver of sovereign immunity must be expressly and unequivocally stated in the text of the relevant statute. It would be bizarre to create an "unequivocal statement" rule and then find that every Spending Clause enactment, no matter what its text, satisfies that rule because it includes unexpressed, implied remedies against the States. The requirement of a clear statement in the text of the statute ensures that Congress has specifically considered state sovereign immunity and has intentionally legislated on the matter. Cf. *Spector* v. *Norwegian Cruise Line Ltd.*, 545 U. S. 119, 139 (2005) (plurality opinion)

---

[7] Of course, the Federal Government has, by statute, waived its sovereign immunity to damages for breach of contract in certain contexts. See, *e.g.*, 28 U. S. C. §1491(a)(1).

("[C]lear statement rules ensure Congress does not, by broad or general language, legislate on a sensitive topic inadvertently or without due deliberation"). Without such a clear statement from Congress and notice to the States, federal courts may not step in and abrogate state sovereign immunity.[8]

IV

Sossamon also argues that §1003 of the Rehabilitation Act Amendments of 1986, 42 U. S. C. §2000d–7, independently put the State on notice that it could be sued for damages under RLUIPA. That provision expressly waives state sovereign immunity for violations of "section 504 of the Rehabilitation Act of 1973, title IX of the Education Amendments of 1972, the Age Discrimination Act of 1975, title VI of the Civil Rights Act of 1964, *or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance*." §2000d–7(a)(1) (emphasis added). Section 1003 makes "remedies (including remedies both at law and in equity) . . . available for such a violation to the same extent as such remedies are available for such a violation in the suit against any public or private entity other than a State." §2000d–7(a)(2). Sossamon contends that §3 of RLUIPA falls within the residual clause of §1003 and therefore §1003 waives Texas' sovereign immunity to RLUIPA suits for damages.

––––––––––

[8] The dissent finds our decision "difficult to understand," *post*, at 6 (opinion of SOTOMAYOR, J.), but it follows naturally from this Court's precedents regarding waiver of sovereign immunity, which the dissent gives astonishingly short shrift. The dissent instead concerns itself primarily with "general remedies principles." *Post*, at 1. The essence of sovereign immunity, however, is that remedies against the government differ from "general remedies principles" applicable to private litigants. See, *e.g.*, *Lane* v. *Peña*, 518 U. S. 187, 196 (1996) (calling it a "crucial point that, when it comes to an award of money damages, sovereign immunity places the . . . Government on an entirely different footing than private parties").

Even assuming that a residual clause like the one in §1003 could constitute an unequivocal textual waiver, §3 is not unequivocally a "statute prohibiting discrimination" within the meaning of §1003.[9]  The text of §3 does not prohibit "discrimination"; rather, it prohibits "substantial burden[s]" on religious exercise.  This distinction is especially conspicuous in light of §2 of RLUIPA, in which Congress expressly prohibited "land use regulation[s] that discriminat[e] . . . on the basis of religion."  §2000cc(b)(2).  A waiver of sovereign immunity must be "strictly construed, in terms of its scope, in favor of the sovereign." *Lane*, 518 U. S., at 192.  We cannot say that the residual clause clearly extends to §3; a State might reasonably conclude that the clause covers only provisions using the term "discrimination."

The statutory provisions specifically listed in §1003 confirm that §3 does not unequivocally come within the scope of the residual clause.  "[G]eneral words," such as the residual clause here, "are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Washington State Dept. of Social and Health Servs.* v. *Guardianship Estate of Keffeler*, 537 U. S. 371, 384 (2003) (internal quotation marks omitted); see also *Jarecki* v. *G. D. Searle & Co.*, 367 U. S. 303, 307 (1961) (noting that this maxim "is often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress").  Unlike §3, each of the statutes specifically enumerated in §1003 explicitly prohibits "discrimination."  See 29 U. S. C. §794(a); 20 U. S. C. §1681(a); 42 U. S. C. §§6101, 6102; 42 U. S. C. §2000d.[10]

———————

[9] Every Court of Appeals to consider the question has so held.  See *Holley*, 599 F. 3d, at 1113–1114; *Van Wyhe*, 581 F. 3d, at 654–655; *Madison*, 474 F. 3d, at 132–133.

[10] Sossamon argues that §3 resembles §504 of the Rehabilitation Act, one of the statutes listed in §1003, because both require special accom-

Opinion of the Court

\* \* \*

We conclude that States, in accepting federal funding, do not consent to waive their sovereign immunity to private suits for money damages under RLUIPA because no statute expressly and unequivocally includes such a waiver. The judgment of the United States Court of Appeals for the Fifth Circuit is affirmed.

*It is so ordered.*

JUSTICE KAGAN took no part in the consideration or decision of this case.

---

modations for particular people or activities. By Sossamon's reasoning, every Spending Clause statute that arguably provides a benefit to a class of people or activities would become a federal statute "prohibiting discrimination," thereby waiving sovereign immunity. Such an interpretation cannot be squared with the foundational rule that waiver of sovereign immunity must be unequivocally expressed and strictly construed.

# SUPREME COURT OF THE UNITED STATES

No. 08–1438

HARVEY LEROY SOSSAMON, III, PETITIONER *v.*
TEXAS ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[April 20, 2011]

JUSTICE SOTOMAYOR, with whom JUSTICE BREYER joins,
dissenting.

The Court holds that the term "appropriate relief" is too
ambiguous to provide States with clear notice that they
will be liable for monetary damages under the Religious
Land Use and Institutionalized Persons Act of 2000
(RLUIPA), 114 Stat. 803, 42 U. S. C. §2000cc *et seq.* I dis-
agree. No one disputes that, in accepting federal funds,
the States consent to suit for violations of RLUIPA's sub-
stantive provisions; the only question is what relief is
available to plaintiffs asserting injury from such viola-
tions. That monetary damages are "appropriate relief" is,
in my view, self-evident. Under general remedies princi-
ples, the usual remedy for a violation of a legal right is
damages. Consistent with these principles, our precedents
make clear that the phrase "appropriate relief" includes
monetary relief. By adopting a contrary reading of the
term, the majority severely undermines the "broad protec-
tion of religious exercise" Congress intended the statute to
provide. §2000cc–3(g). For these reasons, I respectfully
dissent.

I

A

As the Court acknowledges, the proposition that "States

may waive their sovereign immunity" is an "unremark-
able" one. *Seminole Tribe of Fla.* v. *Florida*, 517 U. S. 44,
65 (1996); see also *Alden* v. *Maine*, 527 U. S. 706, 737
(1999) ("[W]e have not questioned the general proposition
that a State may waive its sovereign immunity and con-
sent to suit"); *Atascadero State Hospital* v. *Scanlon*, 473
U. S. 234, 238 (1985) (noting the "well-established" prin-
ciple that "if a State waives its immunity and consents
to suit in federal court, the Eleventh Amendment does
not bar the action"); *Petty* v. *Tennessee-Missouri Bridge
Comm'n*, 359 U. S. 275, 276 (1959) (noting that a State
may waive sovereign immunity "at its pleasure").

  Neither the majority nor respondents (hereinafter
Texas) dispute that, pursuant to its power under the
Spending Clause, U. S. Const., Art. I, §8, cl. 1, Congress
may secure a State's consent to suit as a condition of the
State's receipt of federal funding.[1]  See *College Savings
Bank* v. *Florida Prepaid Postsecondary Ed. Expense Bd.*,
527 U. S. 666, 686 (1999) ("Congress may, in the exercise
of its spending power, condition its grant of funds to the
States upon their taking certain actions that Congress
could not require them to take, and . . . acceptance of the
funds entails an agreement to the actions"); *Atascadero*,
473 U. S., at 247 (suggesting that a federal statute can
"condition participation in the programs funded under the
[statute] on a State's consent to waive its constitutional
immunity").  As with all waivers of sovereign immunity,
the question is whether the State has unequivocally con-
sented to suit in federal court.  See *College Savings Bank*,
527 U. S., at 680; *Atascadero*, 473 U. S., at 238, n. 1.

————————

  [1] Though the Court reserves the general question whether RLUIPA is
a valid exercise of Congress' power under the Spending Clause, see
*ante*, at 2, n. 1, there is apparently no disagreement among the Federal
Courts of Appeals, see 560 F. 3d 316, 328, n. 34 (CA5 2009) ("Every
circuit to consider whether RLUIPA is Spending Clause legislation has
concluded that it is constitutional under at least that power").

Thus, in order to attach a waiver of sovereign immunity to federal funds, Congress "must do so unambiguously," so as to "enable the States to exercise their choice knowingly." *Pennhurst State School and Hospital* v. *Halderman*, 451 U. S. 1, 17 (1981). In other words, the State must have notice of the condition it is accepting. See *Arlington Central School Dist. Bd. of Ed.* v. *Murphy*, 548 U. S. 291, 298 (2006) ("[C]lear notice . . . is required under the Spending Clause"). The reason for requiring notice is simple: "States cannot knowingly accept conditions of which they are 'unaware' or which they are 'unable to ascertain.'" *Id.*, at 296 (quoting *Pennhurst*, 451 U. S., at 17). In assessing whether a federal statute provides clear notice of the conditions attached, "we must view the [statute] from the perspective of a state official who is engaged in the process of deciding whether the State should accept [federal] funds and the obligations that go with those funds." *Arlington Central*, 548 U. S., at 296.

There is also no dispute that RLUIPA clearly conditions a State's receipt of federal funding on its consent to suit for violations of the statute's substantive provisions. The statute states that "program[s] or activit[ies] that receiv[e] Federal financial assistance" may not impose a "substantial burden on the religious exercise of a person residing in or confined to an institution." §2000cc–1. When such a burden has been imposed, the victim "may assert a violation of [RLUIPA] as a claim . . . in a judicial proceeding and obtain appropriate relief against a government," §2000cc–2(a), which the statute defines, as relevant, as "a State, county, municipality, or other governmental entity created under the authority of a State," §2000cc–5(4)(A)(i). Accordingly, it is evident that Texas had notice that, in accepting federal funds, it waived its sovereign immunity to suit by institutionalized persons upon whom it has imposed an unlawful substantial burden. See *Madison* v. *Virginia*, 474 F. 3d 118, 130 (CA4 2006) ("On its face,

RLUIPA . . . creates a private cause of action against the State, and Virginia cannot be heard to claim that it was unaware of this condition" (citations omitted)); *Benning* v. *Georgia*, 391 F. 3d 1299, 1305 (CA11 2004) ("Congress unambiguously required states to waive their sovereign immunity from suits filed by prisoners to enforce RLUIPA").

## B

The Court holds that the phrase "appropriate relief" does not provide state officials clear notice that *monetary relief* will be available against the States, meaning that they could not have waived their immunity with respect to that particular type of liability. This holding is contrary to general remedies principles and our precedents.

RLUIPA straightforwardly provides a private right of action to "obtain appropriate relief against a government." §2000cc–2(a). Under "our traditional approach to deciding what remedies are available for violation of a federal right," damages are the default—and equitable relief the exception—for "it is axiomatic that a court should determine the adequacy of a remedy in law before resorting to equitable relief." *Franklin* v. *Gwinnett County Public Schools*, 503 U. S. 60, 75–76 (1992); see also *Weinberger* v. *Romero-Barcelo*, 456 U. S. 305, 312 (1982) ("The Court has repeatedly held that the basis for injunctive relief in the federal courts has always been . . . the inadequacy of legal remedies"); *Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U. S. 388, 395 (1971) ("Historically, damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty"); cf. *Monsanto Co.* v. *Geertson Seed Farms*, 561 U. S. ___, ___ (2010) (slip op., at 24) ("An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course"). It is unsurprising, therefore, that on more than one occasion Congress has felt it necessary to clarify in the text of a statute

that it meant the terms "relief" and "appropriate relief" to *exclude* damages. See 5 U. S. C. §702 (providing that, under the Administrative Procedure Act, "relief other than money damages" is available against a federal agency to remedy a "legal wrong"); see also 42 U. S. C. §6395(e)(1) (providing a cause of action for "appropriate relief," but specifying that "[n]othing in this subsection shall authorize any person to recover damages"); 15 U. S. C. §797(b)(5) (similar).

If, despite the clarity of this background principle, state officials reading RLUIPA were somehow still uncertain as to whether the phrase "appropriate relief" encompasses monetary damages, our precedents would relieve any doubt. In *Franklin* we made clear that, "absent clear direction to the contrary by Congress," federal statutes providing a private right of action authorize all "appropriate relief," including damages, against violators of its substantive terms. 503 U. S., at 70–71, 75–76. We reiterated this principle in *Barnes* v. *Gorman*, 536 U. S. 181, 185, 187 (2002), affirming that "the scope of 'appropriate relief'" includes compensatory damages.[2] The holdings in these cases are fully consistent with the general principle

_____

[2] The majority suggests that our use of the phrase "appropriate relief" in *Franklin* and *Barnes* did not "put the States on notice that the same phrase in RLUIPA subjected them to suits for monetary relief," because "[t]hose cases did not involve sovereign defendants." *Ante*, at 10, n. 6. The majority misperceives the point. *Franklin* and *Barnes* simply confirmed what otherwise would have been already apparent to any informed reader of RLUIPA—when it comes to remedying injuries to legal rights, monetary damages are "appropriate relief." Moreover, as noted in the text, see *supra*, at 4–5, the Administrative Procedure Act expressly excludes "money damages" from the "relief" available against the United States, suggesting that Congress understands the term normally to encompass monetary relief even when the defendant enjoys sovereign immunity. See 5 U. S. C. §702; *Bowen* v. *Massachusetts*, 487 U. S. 879, 891–892 (1988) (noting that §702 waives the United States' sovereign immunity to suit).

that monetary relief is available for violations of the sub-
stantive conditions Congress attaches, through Spending
Clause legislation, to the acceptance of federal funding.
See *Davis* v. *Monroe County Bd. of Ed.*, 526 U. S. 629, 640
(1999) ("[P]ursuant to Congress' authority under the
Spending Clause . . . private damages actions are avail-
able"); *Gebser* v. *Lago Vista Independent School Dist.*, 524
U. S. 274, 287 (1998) (noting that "[w]hen Congress at-
taches conditions to the award of federal funds under its
spending power . . . private actions holding the recipient
liable in monetary damages" are permissible). It would be
an odd derogation of the normal rules of statutory con-
struction for state officials reading RLUIPA to assume
that Congress drafted the statute in ignorance of these
unambiguous precedents. See *Merck & Co.* v. *Reynolds*,
559 U. S. ___, ___ (2010) (slip op., at 12) ("We normally
assume that, when Congress enacts statutes, it is aware of
relevant judicial precedent").[3]

### C

Accordingly, it is difficult to understand the basis for the
Court's position that the phrase "appropriate relief" in
§2000cc–2(a) fails to provide state officials with clear
notice that waiving sovereign immunity to monetary relief

―――――――

[3] Curiously, the majority appears to believe that it would be appro-
priate for state officials to read the statutory phrase "appropriate relief"
without reference to general remedies principles. See *ante*, at 12, n. 8.
It is well-established, however, that "Congress is understood to legis-
late against a background of common-law . . . principles," *Astoria Fed.
Sav. & Loan Assn.* v. *Solimino*, 501 U. S. 104, 108 (1991), and there can
be no doubt that general legal principles necessarily inform judicial
determinations as to what remedies are available to civil plaintiffs, see,
*e.g.*, *Atlantic Sounding Co.* v. *Townsend*, 557 U. S. ___, ___ (2009) (slip
op., at 15) (concluding that, in light of "general principles of maritime
tort law" punitive damages were a remedy available to the plaintiff
(internal quotation marks omitted)). Why Texas's sovereign immunity
defense renders this approach improper is a mystery the majority
opinion leaves unsolved.

is a condition of accepting federal funds. In arguing that "a waiver of sovereign immunity *to other types of relief* does not waive immunity to damages," *ante*, at 6 (emphasis added), the majority appears to accept that equitable relief is available to RLUIPA plaintiffs. See *Madison*, 474 F. 3d, at 131 (holding that a RLUIPA plaintiff's "claims for equitable relief are not barred by the Eleventh Amendment"); cf. 560 F. 3d 316, 331, 336 (CA5 2009) (reversing the District Court's grant of summary judgment to Texas on one of petitioner's RLUIPA claims for declaratory and injunctive relief). The explanation for the majority's implicit acceptance of suits for injunctive and declaratory relief is obvious enough: It would be a particularly curious reading of the statute to conclude that Congress' express provision of a private right of action to seek "appropriate relief" against "a State" nonetheless left plaintiffs suing for state violations of RLUIPA with *no* available relief.

It is not apparent, however, why the phrase "appropriate relief" is too ambiguous to secure a waiver of state sovereign immunity with respect to damages but is clear enough as to injunctive and other forms of equitable relief. The majority appears to believe that equitable relief is a "suitable" or "proper" remedy for a state violation of RLUIPA's substantive provisions but monetary relief is not; therefore, a state official reading the "open-ended and ambiguous" phrase "appropriate relief" will be unaware that it includes damages but fully apprised that it makes equitable relief available. See *ante*, at 6–7. But sovereign immunity is not simply a defense against certain classes of remedies—it is a defense against being sued at all. See, *e.g.*, *Federal Maritime Comm'n* v. *South Carolina Ports Authority*, 535 U. S. 743, 766 (2002). As a result, there is no inherent reason why the phrase "appropriate relief" would provide adequate notice as to equitable remedies but not as to monetary ones. In fact, as discussed earlier, in light of general remedies principles the presumption

arguably should be the reverse.  See *supra*, at 4–6.

The majority suggests that equitable relief is the sole "appropriate relief" for statutory violations "where the defendant is a sovereign."  *Ante*, at 6–7.  There can be little doubt, however, that the "appropriateness" of relief to be afforded a civil plaintiff is generally determined by the nature of the injury to his legal rights.  See *Franklin*, 503 U. S., at 76 (concluding that monetary damages were "appropriate" because equitable relief offered no redress for the injury suffered); see also *Milliken* v. *Bradley*, 433 U. S. 267, 280 (1977) ("[T]he nature of the . . . remedy is to be determined by the nature and scope of the . . . violation"); *Bell* v. *Hood*, 327 U. S. 678, 684 (1946) ("[W]here federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief"). In support of its proposition the majority cites only to a case in which we expressly *rejected* the argument that state sovereign immunity operates differently according to what type of relief is sought.  See *Federal Maritime*, 535 U. S., at 765 ("[S]overeign immunity applies regardless of whether a private plaintiff's suit is for monetary damages or some other type of relief"); cf. *id.*, at 769 ("[T]he primary function of sovereign immunity is not to protect state treasuries, but to afford the States the dignity and respect due sovereign entities" (citation omitted)).  Nor is the basis for the majority's view apparent from the other cases that it cites.[4]

———————

[4] In *Lane* v. *Peña*, 518 U. S. 187 (1996), *United States* v. *Nordic Village, Inc.*, 503 U. S. 30 (1992), and *Hoffman* v. *Connecticut Dept. of Income Maintenance*, 492 U. S. 96 (1989), we simply reaffirmed the principle that a sovereign's liability for damages must be unambiguously expressed in the statute purporting to waive immunity; as demonstrated above, RLUIPA satisfies this requirement.  The majority tellingly relies on the *dissent's* assertion in *West* v. *Gibson*, 527 U. S. 212 (1999), that the phrase "appropriate remedies" was too ambiguous

The majority's additional arguments in support of its holding also fail to persuade. The majority contends that the use of a "context-dependent" word like "appropriate" necessarily renders the provision ambiguous. *Ante*, at 7. But the fact that the precise relief afforded by a court may vary depending on the particular injury to be addressed in a given case does not render §2000cc–2(a) ambiguous; it simply means that Congress meant for that provision to be comprehensive. See *Pennsylvania Dept. of Corrections* v. *Yeskey*, 524 U. S. 206, 212 (1998) ("[T]he fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth" (internal quotation marks omitted)); cf. *West* v. *Gibson*, 527 U. S. 212, 217–218 (1999) (holding that the phrase "appropriate remedies" in 42 U. S. C. §2000e–16(b) includes remedies not expressly enumerated).

Next, the majority repeats Texas's dictionary-based contention that in using the word "relief" Congress meant to "connot[e] equitable relief." *Ante*, at 8. This proposition suffers from three flaws. First, it is not established by the dictionary to which the majority cites. See Black's Law Dictionary 1293 (7th ed. 1999) ("relief: . . . Also termed *remedy*"); *id.*, at 1296 ("remedy: . . . The means of enforcing a right or preventing or redressing a wrong; *legal or equitable relief*" (emphasis added)). Second, it is inconsistent with our precedent. See *Barnes*, 536 U. S., at 185–187 (noting that "appropriate relief" includes monetary and injunctive relief). Third, it is undermined by the fact that, on numerous occasions, Congress has deemed it necessary to specify that "relief" *includes* injunctive and other equitable relief. See 16 U. S. C. §973i(e) (authoriz-

_____

to waive sovereign immunity to monetary relief. See *id.*, at 226 (opinion of KENNEDY, J.). Accordingly, the cases the majority cites do not mandate the conclusion it draws today.

ing the Attorney General to "commence a civil action for appropriate relief, including permanent or temporary injunction"); see also 2 U. S. C. §437g(a)(6)(A); 8 U. S. C. §1324a(f)(2); 12 U. S. C. §1715z–4a(b); 15 U. S. C. §6309(a). If the term "relief" already connotes equitable relief—and *only* equitable relief—additional explication is redundant.

Finally, the majority asserts that because the parties to this case advance opposing "plausible arguments" regarding the correct interpretation of RLUIPA's text, we must conclude that the statute is ambiguous. *Ante*, at 8–9. This view of how we adjudicate cases is incorrect as a descriptive matter. See, *e.g.*, *Carcieri* v. *Salazar*, 555 U. S. 379, 390 (2009) (reviewing the parties' conflicting textual interpretations of a statute but concluding that it was unambiguous nonetheless). Moreover, I cannot agree with the majority that our capacity to interpret authoritatively the text of a federal statute is held hostage to the litigants' strategic arguments. If this were true, there would be few cases in which we would be able to decide that a statute was unambiguous.

In sum, the majority's conclusion that States accepting federal funds have not consented to suit for monetary relief cannot be reconciled with the fact that the availability of such relief is evident in light of RLUIPA's plain terms and the principles animating our relevant precedents. In so holding, the majority discovers ambiguity where none is to be found.

II

There is another reason to question the soundness of today's decision. The Court's reading of §2000cc–2(a) severely undermines Congress' unmistakably stated intent in passing the statute: to afford "broad protection of religious exercise, to the maximum extent permitted by the

terms of [the statute] and the Constitution." §2000cc–3(g).
I find it improbable that, in light of this express statutory
purpose and the history of "long-running congressional
efforts to accord religious exercise heightened protection
from government-imposed burdens," *Cutter* v. *Wilkinson*,
544 U. S. 709, 714 (2005), state officials would read
RLUIPA's relief provision in the same limited manner the
majority does.[5]

As the majority acknowledges, RLUIPA was Congress'
second attempt to guarantee by statute the "broad protec-
tion" of religious exercise that we found to be unwarranted
as a constitutional matter in *Employment Div., Dept. of
Human Resources of Ore.* v. *Smith*, 494 U. S. 872 (1990).
As we have previously recognized, in passing RLUIPA
Congress was clearly concerned that state institutions
regularly imposed "frivolous or arbitrary barriers im-
ped[ing] institutionalized persons' religious exercise."
*Cutter*, 544 U. S., at 716 (internal quotation marks omit-
ted); see also 146 Cong. Rec. 16698, 16699 (2000) (joint
statement of Sen. Hatch and Sen. Kennedy on RLUIPA)
("Whether from indifference, ignorance, bigotry, or lack of
resources, some institutions restrict religious liberty in

---

[5] I agree with the majority's conclusion that, because Section 3 of
RLUIPA, addressing the rights of institutionalized persons, is not a
"provisio[n] of [a] . . . Federal statute prohibiting discrimination" within
the meaning of the Rehabilitation Act Amendments of 1986, 42 U. S. C.
§2000d–7(a)(1), the latter statute's waiver provision does not put the
States on notice that they can be sued for damages under RLUIPA. See
*ante*, at 12–14. It bears noting, however, that Section 2 of RLUIPA
explicitly prohibits discrimination in land use regulation. See
§2000cc(b)(2) ("No government shall impose or implement a land use
regulation that discriminates . . . on the basis of religion or religious
denomination"). As a result, the majority's decision in this case means
that some RLUIPA plaintiffs will be able to seek monetary damages
against a State and others will not, even though RLUIPA's provision of
"appropriate relief" applies equally to suits for violations of the terms
of both Section 2 and Section 3.

egregious and unnecessary ways"); *ibid.* ("Institutional
residents' rights to practice their faith is at the mercy of
those running the institution . . ."). It is difficult to believe
that Congress would have devoted such care and effort to
establishing significant statutory protections for religious
exercise and specifically extended those protections to
persons in state institutions, yet withheld from plaintiffs a
crucial tool for securing the rights the statute guarantees.

By depriving prisoners of a damages remedy for viola-
tions of their statutory rights, the majority ensures that
plaintiffs suing state defendants under RLUIPA will be
forced to seek enforcement of those rights with one hand
tied behind their backs. Most obviously, the majority's
categorical denial of monetary relief means that a plaintiff
who prevails on the merits of his claim that a State has
substantially burdened his religious exercise will often be
denied redress for the injury he has suffered, because in
many instances "prospective relief accords . . . no remedy
at all." *Franklin*, 503 U. S., at 76; see H. R. Rep. No. 102–
40, pt. 2, p. 25 (1991) (Report of Committee on the Judici-
ary on the Civil Rights Act of 1991) ("The limitation of
relief under Title VII to equitable remedies often means
that victims . . . may not recover for the very real effects of
the [statutory violation]"). Injunctive relief from a federal
court may address a violation going forward, but this
fact will be of cold comfort to the victims of serious, non-
recurring violations for which equitable relief may be
inappropriate.

In addition, the unavailability of monetary relief will
effectively shield unlawful policies and practices from
judicial review in many cases. Under state law, discretion
to transfer prisoners "in a wide variety of circumstances is
vested in prison officials." *Meachum* v. *Fano*, 427 U. S.
215, 227 (1976). A number of RLUIPA suits seeking in-
junctive relief have been dismissed as moot because the
plaintiff was transferred from the institution where the

alleged violation took place prior to adjudication on the merits. See, *e.g.*, *Colvin* v. *Caruso*, 605 F. 3d 282, 287, 289 (CA6 2010); *Simmons* v. *Herrera*, No. C 09–0318 JSW (PR), 2010 WL 1233815, *3 (ND Cal., Mar. 26, 2010); see generally Brief for American Civil Liberties Union et al. as *Amici Curiae* 8–11. Absent a damages remedy, longstanding RLUIPA challenges may well be dismissed for lack of a case or controversy conferring Article III jurisdiction on the federal court. Cf. *Moussazadeh* v. *Texas Dept. of Crim. Justice*, Civ. Action No. G–07–574, 2009 WL 819497, *9 (SD Tex., Mar. 26, 2009) (dismissing as moot plaintiff's RLUIPA claim because he had been transferred to a facility that provided kosher food), remanded, 364 Fed. Appx. 110 (CA5 2010); Opening Brief for Plaintiff-Appellant in *Moussazadeh* v. *Texas Dept. of Crim. Justice*, No. 09–40400 (CA5), p. 11 (noting that transfer to a special facility took place 19 months after the plaintiff filed suit and just before discovery—which had been stayed 12 months for negotiation—was scheduled to recommence). Or, as happened in this case, officials may change the policy while litigation is pending. The fact of "voluntary cessation" may allow some of these claims to go forward, but many will nonetheless be dismissed as moot (as happened in this case).[6]

————————

[6] See *Parents Involved in Community Schools* v. *Seattle School Dist. No. 1*, 551 U. S. 701, 719 (2007) ("Voluntary cessation does not moot a case or controversy unless subsequent events make it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur" (internal quotation marks and alterations omitted)). The Fifth Circuit declined to apply the "voluntary cessation" doctrine in this case and instead granted Texas's motion that the court dismiss as moot petitioner's claim for injunctive relief with respect to the prison's cell-restriction policy. Because the prison director averred that the policy was no longer in force, and "absent evidence that the voluntary cessation [wa]s a sham," the court held that the "good faith nature" of Texas's change in policy rendered moot petitioner's claim for injunctive relief. See 560 F. 3d, at 324–326; see also *Nelson* v. *Miller*, 570 F. 3d

Of course, under the rule the majority announces, Congress can revise RLUIPA to provide specifically for monetary relief against the States, perhaps by inserting the phrase "including monetary relief" into the text of §2000cc–2(a). But we have never demanded that a waiver be presented in a particular formulation to be effective; we only require that it be clear. See, *e.g.*, *Edelman* v. *Jordan*, 415 U. S. 651, 673 (1974) (holding that waiver may be found in "express language" or by "overwhelming implications from the text" (internal quotation marks omitted)). In holding to the contrary, the majority erects a formalistic barrier to the vindication of statutory rights deliberately provided for by Congress.

More problematically, because there is no apparent reason why the term "appropriate relief" is sufficiently clear as to equitable relief but not as to monetary relief, we are left with the very real possibility that, in order to secure a waiver of immunity under the majority's new rule, Congress must now itemize in the statutory text every type of relief meant to be available against sovereign defendants. I, for one, do not relish the prospect of federal courts being presented with endless state challenges to all manner of federal statutes, on the ground that Congress failed to predict that a laundry list of terms must be included to waive sovereign immunity to all forms of relief. I would avoid the problems the majority's decision invites and hold instead that, as is the case here, when a general statutory term like "appropriate relief" is used, clear notice has been provided and a State's acceptance of federal funds constitutes a waiver of sovereign immunity to all relief, equitable and monetary.

———————

868, 882–883 (CA7 2009) (affirming the District Court's dismissal as moot of a RLUIPA claim because there was no evidence that the prison intended to revoke the plaintiff's religious diet); *El* v. *Evans*, 694 F. Supp. 2d 1009, 1012–1013 (SD Ill. 2010) (similar).

SOTOMAYOR, J., dissenting

As explained above, nothing in our precedent demands the result the majority reaches today.  The conclusion that RLUIPA fails to provide States with sufficient notice that they are liable for monetary relief cannot be squared with the straightforward terms of the statute and the general principles evident in our prior cases.  For these reasons, and because the majority's decision significantly undermines Congress' ability to provide needed redress for violations of individuals' rights under federal law, I respectfully dissent.