ATTORNEYS FOR APPELLANT
Mary Jane Lapointe
Daniel Lapointe Kent
Lapointe Law Firm, P.C.
Indianapolis, IN

ATTORNEYS FOR APPELLEE
Curtis T. Hill, Jr.
Attorney General of Indiana

Thomas M. Fisher
Solicitor General
Indianapolis, IN

Andrea E. Rahman
Deputy Attorney General
Indianapolis, IN



FILED

Nov 02 2017, 3:22 pm

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

# In the
# Indiana Supreme Court

———————————————————

No. 49S02-1704-PL-00189

SUZANNE E. ESSERMAN,

*Appellant (Plaintiff below),*

v.

INDIANA DEPARTMENT OF
ENVIRONMENTAL MANAGEMENT,

*Appellee (Defendant below).*

———————————————————

Appeal from the Marion Superior Court, No. 49D04-1509-PL-32140
The Honorable Cynthia J. Ayers, Judge

———————————————————

On Petition to Transfer from the Indiana Court of Appeals, No. 49A02-1605-PL-1129

———————————————————

**November 2, 2017**

**Slaughter, Justice.**

Plaintiff seeks damages under Indiana's False Claims and Whistleblower Protection Act for what she claims was a retaliatory discharge by her employer, the Indiana Department of Environmental Management. Plaintiff's claim does not sound in tort but is based on the

Department's alleged violation of the Act. Indiana has not abrogated common-law sovereign immunity for non-tort claims premised on the violation of a statute. Esserman can thus proceed with her statutory claim only if the State has waived sovereign immunity concerning it. Applying the governing standard, we hold the legislature did not "clearly evince" an intention to waive sovereign immunity by authorizing whistleblower claims under the Act against a generic "employer" without expressly defining that term to include the State. We thus affirm the dismissal of Plaintiff's complaint and remand with instructions.

## Factual and Procedural History

Plaintiff, Suzanne E. Esserman, worked at the Indiana Department of Environmental Management for nearly twenty-five years. Most recently, she oversaw claims for disbursements from the Department's excess-liability trust fund. The fund helps defray the costs of cleaning up petroleum leaks from underground storage tanks. Esserman alleges that certain Department employees approved disbursements from the fund without proper documentation, and that many applicants received payments from the fund to which they were not entitled. Rather than commending Esserman for uncovering irregularities in trust-fund disbursements, the Department fired her.

Believing the Department terminated her in retaliation for objecting to the improper disbursements, Esserman filed a wrongful-termination complaint in the Marion Superior Court, alleging the Department violated the whistleblower provision (Section 8) of the Indiana False Claims and Whistleblower Protection Act, Ind. Code ch. 5-11-5.5. (2010 Repl.). The Department moved to dismiss her complaint on two grounds: first, under Trial Rule 12(B)(1), claiming the trial court lacked subject-matter jurisdiction; and, second, under Rule 12(B)(6), claiming Esserman failed to state a claim upon which relief can be granted. The trial court found for the Department on both grounds and dismissed her complaint. The Court of Appeals reversed and remanded, concluding the Department was not entitled to sovereign immunity, and that the trial court erred in dismissing the complaint. Esserman v. Indiana Dep't. of Envt'l Mgmt., 66 N.E.3d 993 (Ind. Ct. App. 2016). We granted transfer, thus vacating the Court of Appeals' opinion, and now affirm the trial court and remand with instructions.

2

**Standard of Review**

Our case law is not consistent in addressing whether sovereign immunity implicates a court's subject-matter jurisdiction. Rather than resolve this issue today, we note that the trial court premised its dismissal on both Rules 12(B)(1) and 12(B)(6). We elect to review the court's dismissal under the alternative ground that Esserman's complaint failed to state a claim upon which relief can be granted. We leave for another day whether sovereign immunity warrants dismissal on jurisdictional grounds.

A 12(B)(6) motion tests the legal sufficiency of the complaint, requiring that we accept as true all facts alleged in the complaint. Price v. Indiana Dep't. of Child Services, 80 N.E.3d 170, 173 (Ind. 2017) (citation omitted). "We review 12(B)(6) motions de novo and will affirm a dismissal if the allegations are incapable of supporting relief under any set of circumstances." Id. (citation and internal quotation marks omitted). We will also affirm the dismissal if the decision is sustainable on any basis in the record. Id.

**Discussion and Decision**

Indiana has not abrogated common-law sovereign immunity for non-tort claims premised on the violation of a statute. We hold the State has not waived sovereign immunity here because Section 8 of the Act—the whistleblower provision—does not clearly evince the legislature's intention to subject the State to suit for violations of the Act. The trial court was right to dismiss Esserman's claim under Trial Rule 12(B)(6). But the dismissal should have been without prejudice to her filing an amended complaint.

**I.      Although this Court has abrogated common-law sovereign immunity almost entirely for tort claims, we have not done so for non-tort claims based on a statute.**

The doctrine of sovereign immunity, which dates to English common law, prevents the sovereign from being sued in his own courts without his consent. The doctrine took hold in this country from the earliest days of the republic. The federal government enjoys sovereign immunity, Chief Justice Marshall observed, and cannot be sued unless Congress authorizes it. "As the United States are not suable of common right, the party who institutes such suit must bring his case within

the authority of some act of congress, or the court cannot exercise jurisdiction over it." United States v. Clarke, 33 U.S. (8 Pet.) 436, 443 (1834).

In addition to the national government, States also enjoy sovereign immunity, which predates the nation's founding and survived ratification of the U.S. Constitution. "[T]he States' immunity from suit is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution, and which they retain today[.]" Alden v. Maine, 527 U.S. 706, 713 (1999). An early Supreme Court case, Chisholm v. Georgia, 2 U.S. (2 Dall.) 419 (1793), subjected Georgia to suit by a citizen of South Carolina. But the States' strong and swift opposition to Chisholm led to ratification of the Eleventh Amendment two years later in 1795. The Eleventh Amendment immunizes States from federal lawsuits by citizens of other states and has been interpreted to apply to suits by a State's own citizens. See Hans v. Louisiana, 134 U.S. 1 (1890).

From the earliest days of statehood—and even preceding it—our legislature enacted a "reception statute" formally "receiving" or adopting as the law of Indiana much of the common law of England. See I.C. § 1-1-2-1 (Fourth); See also 1807 Ind. Acts (Terr.) Ch. XXIV, pp. 139-40 (approved Sept. 7, 1807); 1824 Ind. Acts Ch. LVIII, pp. 256-57 (approved Jan. 2, 1818); 1 Ind. Rev. St. ch. 61, pp. 351-52 (1852) (§ 1 codified at Ind. Code § 1-1-2-1 (2017); § 2 codified as amended at § 1-1-2-2 (1993)). What Indiana "received" are those common-law principles, including sovereign immunity, that existed before 1607, the fourth year of the reign of James I of England, so long as they were not inconsistent with the constitutions and statutes of the United States or of the State of Indiana. State v. Home Brewing Co. of Indianapolis, 182 Ind. 75, 79, 105 N.E. 909, 911 (1914). See also Perkins v. State, 252 Ind. 549, 552, 251 N.E.2d 30, 32 (Ind. 1969) ("This principle [of sovereign immunity] was carried over in our colonial system of the common law.").

Until the adoption of our 1851 constitution, "the only recognized method for bringing an action against the State was to convince the legislature to pass an act authorizing a particular individual to bring suit." State v. Rendleman, 603 N.E.2d 1333, 1335 (Ind. 1992). See, e.g., State v. Trustees of the Vincennes Univ., 5 Ind. 77, 84-85 (1854) (referencing 1846 legislation entitled "an act to authorize the trustees of the Vincennes university to bring suit against the state of Indiana, and for other purposes"). But the 1851 constitution expressly banned this practice of legislating

4

individual waivers, specifying that the legislature can waive sovereign immunity only by enacting a "general law":

> Provision may be made, by general law, for bringing suit against the State, as to all liabilities originating after the adoption of this Constitution; but no special act authorizing such suit to be brought, or making compensation to any person claiming damages against the State, shall ever be passed.

1 Rev. St., p. 52, Ind. Const. art. IV, § 24 (1852). The legislature did not waive sovereign immunity until 1889, "when it passed legislation allowing individuals with contract claims to sue the State." Rendleman, 603 N.E.2d at 1335 (citing Carr v. State, 127 Ind. 204, 26 N.E. 778 (1891)).

Over the years, the rule in Indiana remained that only the legislature, by enacting a general law, could waive the State's sovereign immunity. "In the absence of a statutory law creating a liability, the rule universally recognized and enforced is that neither a state nor the United States is legally liable to respond in damages to a person for an injury resulting from the misconduct, negligence, or tortious acts of its officers or agents." State v. Mutual Life Ins. Co. of New York, 175 Ind. 59, 71, 93 N.E. 213, 218 (1910) (citations omitted). See also City of Indianapolis v. Indianapolis Water Co., 185 Ind. 277, 291, 113 N.E. 369, 373 (1916). That rule continued into the 1950s, when we held that consent to being sued "can be given by the state only by a legislative enactment clearly evincing such consent." State ex rel. Indiana Dept. of Conservation v. Pulaski Circuit Court, 231 Ind. 245, 251, 108 N.E.2d 185, 187 (1952) (citations omitted).

But things began to change mid-century. Governmental immunity from tort liability fell into disfavor. In 1959, the General Assembly passed legislation that would have authorized tort suits against units of local government, see Indiana Senate Journal 1959, Regular Session, S.B. No. 63, at 67 ("providing for the enforcement and collection of claims in tort against the units of government of the State of Indiana" and "providing the procedure to enforce such claims"). But the governor vetoed the legislation. See Indiana Senate Journal 1959, Regular Session, S.B. No. 63, at 1099 . See also Perkins, 252 Ind. at 555, 251 N.E.2d at 34.

In 1960 our judiciary, not content with the pace of change in the political branches, took matters into our own hands. In a series of decisions over a dozen years, culminating in Campbell v. State, 259 Ind. 55, 284 N.E.2d 733 (1972), we abrogated almost all common-law governmental immunity from tort liability. First, in Flowers v. Board of Comm'rs of County of Vanderburgh, 240

Ind. 668, 671-72, 168 N.E.2d 224, 225 (1960), we held that cities and counties remained immune under the common law in connection with their "governmental functions" but not their "proprietary functions". Next, in Brinkman v. City of Indianapolis, 141 Ind. App. 662, 668-69, 231 N.E.2d 169, 172-73 (1967), our court of appeals abrogated even governmental-function immunity for municipal corporations. And in Klepinger v. Board of Comm'rs of County of Miami, 143 Ind. App. 178, 201, 239 N.E.2d 160, 172-73 (1968), the court extended the abrogation to counties, too.

Through and including Klepinger, the only common-law immunity judicially abrogated was for counties and municipal corporations. Not until 1969 did we judicially revoke common-law immunity for the State. In Perkins, we abolished common-law immunity concerning the State's proprietary functions. 252 Ind. at 557-58, 251 N.E.2d at 35. And in Campbell, we finished the task, abolishing the State's common-law immunity for governmental functions, too, except for the well-known trio of court-prescribed circumstances where the immunity remains intact: preventing crime, appointing officials to public office, and decision-making by the courts. 259 Ind. at 62-63, 284 N.E.2d at 737. Campbell thus reversed the prevailing legal presumption concerning the State's immunity. Previously, the State was immune from tort liability unless the legislature expressly consented to suit. Afterward, the State had no immunity for tort claims (save for the three narrow exceptions) unless the legislature expressly conferred it.

These seminal cases, along with our most recent pronouncements on the subject, recognized judicial abrogation of common-law governmental immunity for claims sounding in tort. See, e.g., Veolia Water Indianapolis, LLC v. National Trust Ins. Co., 3 N.E.3d 1, 7 (Ind. 2014) (noting "immunity of governmental units *from tort liability* in a series of decisions culminating with Campbell") (emphasis added); F.D. v. Indiana Dept. of Child Services, 1 N.E.3d 131, 136 (Ind. 2013) ("Under Indiana common law, with very limited exception, governmental entities are thus subject to liability under traditional tort theories.").

In the aftermath of Campbell, our General Assembly in 1974 enacted the Indiana Tort Claims Act, which grants immunity from tort liability to many governmental entities, including the State. Since the Act's passage, we have interpreted many of its provisions and defined the contours of when it immunizes a governmental entity from liability. But we have not strayed from our earlier,

6

Campbell-era conclusions that what we were abrogating judicially was common-law governmental immunity for claims sounding in tort.

**II.**   **Because the State retains sovereign immunity for non-tort claims, the statute on which Esserman's claim is based must "clearly evince" the State's consent to suit.**

Having determined that the State retains common-law sovereign immunity for non-tort claims based on a statute, we consider next the showing required for the legislature to waive its immunity.

We previously announced the specificity required for the legislature to waive sovereign immunity in Pulaski Circuit Court. There, we determined the State's consent to suit can be given only by a legislative enactment "clearly evincing" such consent. 231 Ind. at 251, 108 N.E.2d at 187 (citations omitted). Of course, Pulaski predates Campbell by twenty years. So the question today is whether the Pulaski standard continues to govern even after Campbell abrogated most of the State's common-law immunity for torts. We hold that it does.

Campbell addressed a *substantive* question—what claims have been judicially abrogated? Pulaski, in contrast, addressed a *procedural* question—what statutory language must the legislature employ to establish its intention to waive immunity? We adhere to Pulaski's determination that a statute does not waive immunity unless that intention is "clearly evince[d]", creating a presumption against waiver of sovereign immunity absent statutory language to the contrary.

The rule that statutory grants of immunity are construed narrowly, see F.D., 1 N.E.3d at 136, does not apply here. That rule derives from cases interpreting our Tort Claims Act—a statute in derogation of Campbell's common-law principle abrogating nearly all governmental immunity for tort claims. But, as we have explained, Campbell did not abrogate common-law immunity for *non-tort* claims based on a statute. Thus, the common law applicable to such non-tort claims, including Esserman's claim, is that State sovereign immunity remains intact. That means the rule applicable here is precisely the opposite—what is construed narrowly is not the legislature's *grant* of immunity but its purported *waiver* of it. A statute allegedly waiving immunity for such claims, therefore, also is in derogation of our common law and likewise must be construed narrowly.

7

Our high bar for overcoming the presumption against waiver is consistent with the federal standard for assessing whether Congress has waived federal sovereign immunity. "A waiver of the Federal Government's sovereign immunity must be unequivocally expressed in statutory text[.]" Lane v. Pena, 518 U.S. 187, 192 (1996) (citation omitted). This lofty standard also applies to claims that Congress has waived the sovereign immunity of States. Congress can authorize private suits against nonconsenting States under its enforcement power, conferred by Section 5 of the Fourteenth Amendment: "The Congress shall have power to enforce, by appropriate legislation, the provisions of this article." When Congress exercises its enforcement power, the Supreme Court requires "an unequivocal expression of congressional intent" to overturn State immunity. Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 99 (1984). The same "unequivocal expression" of intent applies to a State's consent to suit in federal court. Id. (citation omitted). "The test for determining whether a State has waived its immunity from federal-court jurisdiction is a stringent one." Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 241 (1985). Waiver is not implied, and will be found only when the State makes such a "clear declaration" of its consent to suit. See Sossamon v. Texas, 563 U.S. 277, 284 (2011) (quoting College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 680 (1999)).

These authorities, consistent with Pulaski, persuade us that we should not conclude lightly that our legislature has waived State immunity. These authorities also confirm not only the importance of the statute's clarity, but also the need for an affirmative "expression" or "declaration" of the legislature's intention to waive the State's immunity. We will thus find a waiver of sovereign immunity only when the statute at issue contains an unequivocal affirmative statement that clearly evinces the legislature's intention to subject the State to suit for the specific statutory claim asserted.

III.   **The False Claims and Whistleblower Protection Act does not clearly evince the State's consent to be sued.**

Finally, we consider whether the Act's whistleblower provision is the kind of unequivocal affirmative statement that "clearly evinces" the legislature's intention to waive the State's sovereign immunity. We conclude it is not.

Esserman bases her claim on Indiana Code section 5-11-5.5-8. This statute provides a cause of action to, among others, employees discharged by their employers for objecting to violations of

8

the Act's false-claims provisions.

> Sec. 8. (a) An employee who has been discharged, demoted, suspended, threatened, harassed, or otherwise discriminated against in the terms and conditions of employment by the employee's employer because the employee:
>
>> (1) objected to an act or omission described in section 2 of this chapter; or
>>
>> (2) initiated, testified, assisted, or participated in an investigation, an action, or a hearing under this chapter;
>
> is entitled to all relief necessary to make the employee whole.
>
> *  *  *
>
> (c) An employee may bring an action for the relief provided in this section in any court with jurisdiction.

I.C. § 5-11-5.5-8 (2010 Repl.). Esserman sued her employer, the Department, under Section 8, alleging she was terminated in retaliation for objecting to false-claims violations allegedly committed by other Department employees.

As we have said, we will not presume the legislature intended the Act to apply to the State. The Act must clearly evince the legislature's waiver of the State's sovereign immunity by providing an unequivocal affirmative statement of the legislature's intention to allow this statutory cause of action against the State. The Act does not do so here. The statute, while clearly stating that an employee may sue her employer, does not name the State (or one of its agencies or officials) as a permissible whistleblower defendant. Had the legislature intended to subject the State to whistleblower liability, it could have expressed that intention any number of ways. It could have said, for example, that state employees are eligible plaintiffs under Section 8; or defined "employer" to include the State; or authorized remedies that are unique to State employees to make clear they, too, are among those entitled to sue. This is not an exhaustive list, to be sure. But the legislature did none of these things—or anything else that would "clearly evince" or "unequivocally express" its intention to waive State immunity for whistleblower claims.

Though irrelevant to waiver, we note that aggrieved state employees are not without recourse under Indiana law. The State Personnel Act unambiguously affords a legal remedy to state-agency employees who face retaliatory discipline for having reported violations of state or

federal law. <u>Id.</u> §§ 4-15-10-1, -4. The remedy, which is not as generous as that provided by the False Claims and Whistleblower Protection Act, consists of thirty days' back pay and reinstatement in the former position. But the personnel law provides a quicker review process. <u>Id.</u> § 4-15-2.2-42(e). <u>See</u> <u>also</u> <u>Shoemaker v. Indiana State Police Dep't.</u>, 62 N.E.3d 1242 (Ind. Ct. App. 2016). These tradeoffs are consistent with our conclusion that the legislature intended the personnel law to be the exclusive retaliatory-discharge remedy available to state employees. Of course, the legislature can always provide state employees with additional remedies. But to overcome sovereign immunity, it must "clearly evince" its intention to do so.

### Conclusion

For these reasons, we affirm the dismissal of Esserman's complaint under Rule 12(B)(6) and remand to the trial court with instructions to permit Esserman to file an amended complaint.

Rush, C.J., and Massa and Goff, JJ., concur.

David, J., dissents with separate opinion.

**David, J., dissenting.**

While I appreciate Justice Slaughter's thoughtful majority opinion, I must respectfully dissent. In my view, the term "employer" is clear and unambiguous. I believe its plain meaning includes the State.

The first step in statutory interpretation is to determine whether the legislature has spoken clearly and unambiguously on the point in question. Sees v. Bank One, Indiana, N.A., 839 N.E.2d 154, 157 (Ind. 2005). When a statute is clear and unambiguous, we need not apply any rules of construction other than to require that words and phrases be taken in their plain, ordinary, and usual sense. Young v. Hood's Gardens, Inc., 24 N.E.3d 421, 424–25 (Ind. 2015) (internal quotations and citations omitted.) We presume the legislature intended logical application of the language used in the statute, so as to avoid unjust or absurd results. State v. Evans, 810 N.E.2d 335, 337 (Ind. 2004) (internal quotation and citation omitted).

Here, while "employer" is not defined in the relevant statutory section, it seems the plain and usual meaning would include the State. Black's Law Dictionary defines employer broadly as "[a] person, company or organization for whom someone works; esp., one who controls and directs a worker under an express or implied contract of hire and who pays the worker's salary or wages." Black's Law Dictionary 641 (10th ed. 2014). Certainly, the State provides jobs that pay wages or a salary to its employees. While I agree with the majority that the legislature could have defined employer in this section to include the State, I do not believe that not including such a definition serves to *exclude* the State looking at the plain language here. There is no limiting language indicating any exceptions or carve outs for the State or any other entity that has employees. Employer is not a term of art and its plain meaning is broad and easily understood. Thus, I believe that Esserman could bring a claim pursuant to the whistleblower statute.