


**FILED**

Dec 23 2024, 9:29 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

I N  T H E

# Court of Appeals of Indiana

Jason Kelly and Myka Kelly, for themselves and their minor children, A.S, A.T.M, A.E.M., A.C.M., J.T.K. and J.E.K., as assignees of Sandra Sell,

*Appellants-Plaintiffs*

v.

State of Indiana,

*Appellee-Defendant*

---

December 23, 2024

Court of Appeals Case No.
24A-CT-859

Appeal from the Marion Superior Court

The Honorable Christina R. Klineman, Judge
The Honorable Ian Stewart, Magistrate

Trial Court Cause No.
49D01-2302-CT-7005

**Foley, Judge.**

[1] Jason and Myka Kelly, for themselves and their minor children A.S., A.T.M., A.E.M., A.C.M., J.T.K., and J.E.K. (collectively, "the Kellys"), appeal the order granting summary judgment to the State on their claim, as assignees of Sandra Sell ("Sell"), that the State wrongfully failed to defend and indemnify Sell against civil rights claims the Kellys brought against Sell. Concluding that the State is not obligated to defend and indemnify Sell, a former employee of the Indiana Department of Child Services ("DCS"), for civil liability stemming from her own criminal conduct, we affirm summary judgment for the State.

## Facts and Procedural History

[2] In 2020, Sell was a family case manager with DCS assigned to handle matters involving the Kelly family. Appellants' App. Vol. 2 p. 26. During this time, Sell engaged in an intimate relationship with the father of one of the children. *Id.* at 65–68. Sell eventually falsified DCS records and presented false information to the trial court in connection with the Kelly case. *Id.* As a result of Sell's actions, the Kelly children were removed from their home from December 11, 2020, through April 27, 2021. *Id.* at 26. The State brought criminal charges against Sell in November 2021. *Id.* at 70–71. In the charging information, the State specifically alleged that Sell committed (1) Class A

misdemeanor obstruction of a child abuse assessment; (2) Level 6 felony obstruction of justice; (3) and Level 6 felony official misconduct. *Id.* Sell pleaded guilty to obstruction of justice in April 2022. *Id.* at 56–76.

[3] In August 2021—while the criminal case was pending, but before Sell pleaded guilty—the Kellys presented the Office of the Attorney General with a draft complaint alleging Sell committed civil rights violations as an employee of DCS. *Id.* at 15. Mediation was conducted in January 2022, at which point the State was involved and provided counsel for Sell. *Id.* As a result of mediation, the State reached a conditional settlement agreement ("the Mediated Agreement") on behalf of Sell requiring approval from the Attorney General and the Governor. *Id.* Under the circumstances, the Governor's approval was required under Indiana Code section 34-13-4-1(2)(A), which grants the Governor exclusive authority to determine whether paying any "settlement of the [civil rights] claim or suit" serves the best interests of the governmental entity. The Mediated Agreement (1) contemplated that the Kellys "would release their claims in exchange for $2.75 million" and (2) "did not contemplate that Sell would personally contribute to the amount of the settlement." Appellants' App. Vol. 2 p. 15. In May 2022, the State "informed the Kellys that the conditions of the Mediated Agreement had not been met." *Id.* at 16.

[4] The Kellys then filed a complaint against Sell and others in June 2022, asserting claims under Title 42, section 1983 of the United States Code. *Id.* at 16. After the complaint was filed, Sell requested that the Attorney General again provide a defense. *Id.* at 113. The Attorney General denied that request on July 14,

2022.  *Id.* at 50–51.  Sell retained private counsel and, in February 2023, entered into a settlement agreement ("the Agreement") with the Kellys, which provided for a cash settlement and the assignment of Sell's indemnification rights to the Kellys.  *Id.* at 26–33, 114.  Under the Agreement, the Kellys "consent[ed] to settle their claims against Sell in exchange for . . . $6 million."  *Id.* at 28.  In a portion of the document titled "Recitals and Statement of Relevant Facts," the Agreement contemplated that Sell was entitled to indemnification from the State, reciting that the State "has a statutory duty to defend and indemnify any present and former public employee for personal civil liability for a loss occurring because of a noncriminal act or omission within the scope of the public employee's employment" and the State "assumed a duty to defend Sell when it entered into [the Mediated Agreement] on her behalf that imposed no personal liability on her."  *Id.* at 26–27.  The Agreement incorporated those statements, specifying that those factual matters were "an integral part of th[e] Agreement."  *Id.* at 28.  Furthermore, in light of the possibility that Sell could recover the $6 million settlement value in an action against the State, the Agreement assigned to the Kellys any such right to recovery.  *Id.* at 29–30.

[5]     As assignees of Sell's potential right to indemnification, the Kellys filed this action against the State on February 17, 2023.  *Id.* at 3.  The Kellys asserted that the State wrongfully failed to defend and indemnify Sell in the civil rights litigation, resulting in damages to Sell of $6 million owed to the Kellys under

the Agreement.[1] The State moved for summary judgment, designating the Agreement (attached to the complaint as Exhibit B) and records from Sell's criminal case. *See id.* at 26–33, 47–48. The State argued that Sell's liability stemmed from her own criminal conduct, which extinguished any statutory obligation to defend and indemnify Sell. The Kellys responded that the State was still obligated to defend and indemnify Sell because, among other things, (1) not all of Sell's conduct was criminal and (2) the State previously provided Sell a defense with the pre-suit negotiation of the claims and, having done so, the State was obligated to keep providing a defense. The trial court held a hearing and took the matter under advisement. On March 25, 2024, the trial court granted summary judgment to the State. *Id.* at 4–5. In its written order, the trial court explained that Sell was not entitled to a defense because, among other things, Sell's civil liability stemmed from her own criminal conduct. *Id.* at 6–7. The trial court also rejected the Kellys' contention that the State could not withdraw its defense of Sell. *Id.* at 8–9. The Kellys now appeal.

## Discussion and Decision

## I.   Standard of Review

We review a trial court's grant of summary judgment de novo. *Cave Quarries, Inc. v. Warex LLC*, 240 N.E.3d 681, 684 (Ind. 2024). Summary judgment is

---

[1] The Kellys did not claim other types of losses, such as fees Sell might have incurred by retaining counsel. *See* Appellants' App. Vol. 2 pp. 17–19 (focusing on damages in the amount of the $6 million settlement).

appropriate when there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C). The moving party bears the initial burden of making a prima facie showing that it is entitled to summary judgment by designating evidence demonstrating the absence of any genuine issue of material fact on a determinative issue. *Id.*; *Hughley v. State*, 15 N.E.3d 1000, 1003 (Ind. 2014). Only then does the burden shift to the non-moving party to come forward with contrary evidence showing a genuine issue for trial. T.R. 56(E). Under this standard, "Indiana consciously errs on the side of letting marginal cases proceed to trial on the merits, rather than risk short-circuiting meritorious claims." *Hughley*, 15 N.E.3d at 1004. Indeed, summary judgment presents a "high bar" for the movant. *Id.*

[7] Here, the motion for summary judgment implicated questions of statutory interpretation. We interpret statutes de novo. *ESPN, Inc. v. Univ. of Notre Dame Police Dep't*, 62 N.E.3d 1192, 1195 (Ind. 2016). Our primary goal in statutory interpretation is to determine and give effect to legislative intent. *Adams v. State*, 960 N.E.2d 793, 798 (Ind. 2012). The best evidence of legislative intent is the statutory text itself, and when that language is clear and unambiguous, we simply apply its plain and ordinary meaning. *Rodriguez v. State*, 129 N.E.3d 789, 796 (Ind. 2019). We read the statute as a whole, giving effect to every word and phrase. *ESPN*, 62 N.E.3d at 1195. Further, we avoid interpretations that would render any part of the statute meaningless or superfluous. *Id.* at 1999. This interpretive task is particularly exacting when analyzing statutes that waive sovereign immunity, as such statutes must be strictly construed

against liability. *See Esserman v. Ind. Dep't of Env't Mgmt.*, 84 N.E.3d 1185, 1191–92 (Ind. 2017).

## II. Statutory Duty to Defend and Indemnify

[8] Indiana Code section 34-13-4-1 provides that when a public employee "is or could be subject to personal civil liability for a loss occurring because of a noncriminal act or omission within the scope of the public employee's employment [that] violates the civil rights laws of the United States," the governmental entity shall—subject to certain provisions—pay any judgment and "all costs and fees incurred by or on behalf of a public employee in defense of the claim or suit." Our Supreme Court recently addressed this statute's "noncriminal" requirement in *State ex rel. Department of Natural Resources v. Leonard*, 226 N.E.3d 198, 203 (Ind. 2024). The Court explained that, for an act to be "noncriminal," the act must be one for which "the State cannot establish a prima facie showing of criminal conduct." *Leonard*, 226 N.E.3d at 203.

[9] The Kellys ask us to interpret Indiana Code section 34-13-4-1 as a form of "insurance" for State employees, arguing that we should apply common law indemnification principles developed in the context of insurance law. Focusing on common law principles of insurance law, the Kellys ask us to strictly construe the statute in favor of liability because the statute did not explicitly abrogate those principles. Critically, however, the Kellys' indemnity argument misapprehends the relationship between sovereign immunity and statutory waivers of that immunity. At common law, the State enjoyed complete

immunity from suit under the doctrine of sovereign immunity. *See Campbell v. State*, 284 N.E.2d 733, 734–38 (1972) (recounting sovereign immunity's historical roots in Indiana). Enjoying complete immunity, the State had no common law obligation to defend or indemnify its employees. Thus, rather than abrogate common law principles of indemnification, Indiana Code section 34-13-4-1 partially waives the State's sovereign immunity by establishing specific circumstances under which the State will defend and indemnify its employees. Because the statute creates liability where none existed at common law, we must strictly construe the statute against establishing liability and cannot expand the statute's reach beyond its express terms. *See Esserman*, 84 N.E.3d at 1191–92 (noting that statutes in derogation of sovereign immunity are strictly construed against liability). Therefore, we reject the Kellys' invitation to supplement the statutory requirements with common law principles applicable to private actors that did not enjoy sovereign immunity.

[10] Having established that we must strictly construe the statute's requirements against liability, we turn to whether Sell's claimed "loss occur[red] because of a noncriminal act or omission." I.C. § 34-13-4-1. Below, the State obtained summary judgment on the basis that Sell's liability stemmed from her own criminal conduct. The Kellys respond that even though Sell engaged in some criminal conduct, the State still had a duty to defend and indemnify her because their complaint against Sell included allegations of noncriminal conduct, such as "loan[ing] money to [an] abusive father so he could buy dishes and toys" and "instruct[ing] the abusive father not to allow the child to communicate with his

mother." Appellants' Br. pp. 22–23. The Kellys assert that these noncriminal acts supported "distinct claims based on different constitutional rights." *Id.*

[11] Although the Kellys point out that their complaint included allegations about noncriminal conduct, the statutory language focuses our inquiry differently. The statute asks whether the "loss occur[red] because of a noncriminal act or omission." I.C. § 34-13-4-1. Here, the Kellys are pursuing claims as Sell's assignee under the Agreement, which specified that their $6 million settlement was premised on the fact that "the wrongful removal of children from their home can be extremely damaging" and that "jury awards in such cases are large." Appellants' App. Vol. 2 p. 27. Moreover, the Agreement stated that, "as a result of Sell's actions, the Kelly children were removed" from their home. *Id.* at 26. Thus, our analysis of this issue properly focuses on whether Sell's conduct that caused the removal of the Kelly children was criminal in nature.

[12] The designated evidence established that Sell's criminal conduct was inextricably linked to the removal of the children. At Sell's guilty plea hearing, she admitted that while serving as the family case manager for the Kellys, she engaged in an intimate relationship with the father of one of the children and concealed that relationship from DCS and the court. Appellants' App. Vol. 2 pp. 65–66. Sell also admitted to falsifying DCS records and presenting false information to the court with the intent to mislead a public servant. *Id.* at 66. These criminal acts materially contributed to the removal of the children—the very action that forms the basis of Sell's alleged loss, i.e., the $6 million settlement. Because Sell's criminal conduct was not merely incidental to but

rather an integral part of the circumstances leading to the damages claimed under the Agreement, we conclude that Sell's conduct fell outside the scope of Indiana Code section 34-13-4-1, and therefore, the State had no duty to indemnify Sell for the settlement.

## III. Effect of Prior Defense

[13] The Kellys alternatively argue that the State's participation in the pre-suit mediation created an ongoing obligation to defend and indemnify Sell. They contend that the State, having undertaken Sell's defense during early mediation efforts, was estopped from later declining to defend her. We disagree. When the State initially participated in mediation in January 2022, Sell had not yet pleaded guilty. After Sell's guilty plea established the criminal nature of her conduct, the State promptly informed Sell that it would not provide a defense to the Kellys' subsequently filed civil rights action. Appellants' App. Vol. 2 pp. 50–51. The State's preliminary involvement in settlement discussions, undertaken before Sell's criminal conduct was conclusively established, did not override the plain statutory requirement that the State's duty to indemnify applies only to losses occurring "because of a noncriminal act or omission." I.C. § 34-13-4-1.

[14] Moreover, although the Kellys argue that common law indemnity principles should apply, as earlier discussed, the relationship between the State and its employees regarding defense and indemnification is governed by statute, not the common law. *Cf. Leonard*, 226 N.E.3d at 203 (analyzing the "unambiguous mandates" of Indiana Code section 34-13-4-1). Thus, to the extent the Kellys

attempt to import insurance law principles of estoppel or common law duties regarding reservation of rights, *see* Appellants' Br. pp. 11–20, their reliance on these principles is misplaced. The statutory framework here expressly governs when the State must defend and indemnify its employees. Under that framework, even when the State has initially appeared on behalf of an employee, it is implicit that the State may withdraw its defense when the employee's conduct is conclusively established as criminal. Indeed, the State's obligation to defend exists only for "noncriminal" conduct, I.C. § 34-13-4-1, and, here, Sell's guilty plea established that her conduct was, in fact, criminal. Therefore, because the statutory framework controls and the conduct at issue was criminal conduct, the State was entitled to withdraw its defense of Sell.[2]

## Conclusion

[15] Because Sell's criminal conduct was integral to her alleged loss under the Agreement, the State had no obligation to indemnify Sell for the loss. The limited waiver of sovereign immunity under Indiana Code section 34-13-4-1 does not extend to such circumstances, and the State's preliminary involvement

---

[2] Having resolved the case on the stated grounds, we need not address other issues presented. However, we note in passing that allowing the recovery of settlements through damages claims would also raise separation of powers concerns, as the Indiana General Assembly has vested the Governor with exclusive authority to determine whether payment of any "settlement of the claim or suit" serves the best interests of the governmental entity. Ind. Code § 34-13-4-1(2)(A); *see State ex rel. Ind. State Bd. of Fin. v. Marion Cty. Superior Court, Civil Div.*, 396 N.E.2d 340, 343 (Ind. 1979) (explaining that courts "cannot compel exercise of a discretionary act in any particular manner").

in settlement discussions before Sell's guilty plea did not compel the State to indemnify Sell. Thus, summary judgment was properly entered for the State.

[16] Affirmed.

Bailey, J. and Bradford, J., concur.

ATTORNEY FOR APPELLANTS

Brad A. Catlin
Williams Law Group, LLC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Benjamin M.L. Jones
Section Chief, Civil Appeals

Evan Matthew Comer
Deputy Attorney General
Indianapolis, Indiana