RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 23a0091p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

COMMONWEALTH OF KENTUCKY; STATE OF TENNESSEE,

    *Plaintiffs-Appellees*,

    *v.*

JANET YELLEN, in her official capacity as Secretary of the Treasury; RICHARD K. DELMAR, in his official capacity as Acting Inspector General of the Department of the Treasury; UNITED STATES DEPARTMENT OF THE TREASURY,

    *Defendants-Appellants*.

> No. 21-6108

---

On Petition for Rehearing En Banc

United States District Court for the Eastern District of Kentucky at Frankfort.
No. 3:21-cv-00017—Gregory F. Van Tatenhove, District Judge.

Decided and Filed:  May 3, 2023

Before: BUSH and NALBANDIAN, Circuit Judges.[*]

---

## COUNSEL

**ON PETITION FOR REHEARING EN BANC:**  Daniel Winik, Alisa B. Klein, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellants.  **ON RESPONSE:** Matthew F. Kuhn, Michael R. Wajda, OFFICE OF THE ATTORNEY GENERAL OF KENTUCKY, Frankfort, Kentucky, Andrée S. Blumstein, J. Matthew Rice, OFFICE OF THE ATTORNEY GENERAL AND REPORTER OF TENNESSEE, Nashville, Tennessee, for Appellees.

---

[*]In view of the retirement of Hon. Bernice Bouie Donald, the third member of the original panel in this appeal, this order is entered by a quorum of the panel.  28 U.S.C. § 46(d).

BUSH, J. (pp. 3–9), issued a statement, in which KETHLEDGE, THAPAR, and NALBANDIAN, JJ., joined, regarding the denial of rehearing en banc.  GRIFFIN, J. (pp. 10–19), delivered a separate opinion, in which CLAY, GIBBONS, and STRANCH, JJ., joined, dissenting from the denial of the petition for rehearing en banc.

————————————

**ORDER**

————————————

The court received a petition for rehearing en banc.  The original panel has reviewed the petition for rehearing and concludes that the issues raised in the petition were fully considered upon the original submission and decision.  The petition then was circulated to the full court.  Less than a majority of the judges voted in favor of rehearing en banc.

Therefore, the petition is denied.

---

## STATEMENT

---

JOHN K. BUSH, Circuit Judge, issuing a statement regarding the denial of en banc.

During the debates over ratification of the Constitution, Alexander Hamilton, writing as Publius, insisted that states would retain their authority over their own taxation "in the most absolute and unqualified sense"—keeping any power to infringe that authority out of the new federal government's hands. *See* THE FEDERALIST NO. 32, at 154 (Alexander Hamilton) (George W. Carey & James McClellan eds., 2001) (arguing that "an attempt on the part of the national Government to abridge [the States] in the exercise of [their taxing authority] would be a violent assumption of power, unwarranted by any article or clause of its constitution"). As Hamilton explained, other than "the power of imposing taxes . . . on exports and imports," which would vest exclusively at the national level, "the power of imposing taxes" would be "manifestly a concurrent and co-equal authority in the United States and in the individual states." *Id.* at 156; *see also* THE FEDERALIST NO. 34, at 162 (Alexander Hamilton) (George W. Carey & James McClellan eds., 2001) ("[T]he particular states, under the proposed constitution, would have co-equal authority with the union in the article of revenue, except as to duties on imports."). Because taxing power would be held concurrently by the federal government on the one hand and the states on the other, there would be "no power on either side to annul the acts of the other." *Id.* at 163.

This appeal tested Hamilton's argument. The state of Tennessee claimed that, as part of the American Rescue Plan Act of 2021 (ARPA), Congress included a component—the "Offset Provision"—that could be read to give the federal government control over that state's taxing power.[1] Specifically, as Tennessee argued, the Offset Provision, codified at 42 U.S.C.

---

[1]The states of Tennessee and Kentucky both sued to challenge the application of the Offset Provision. Although the panel majority held that Kentucky's claim was nonjusticiable because its claim had been mooted by a Department of Treasury rule that stated how Treasury would enforce the Offset Provision, Tennessee's claim remained viable based on its alleged injury from costs of compliance with the Treasury rule and the underlying Offset Provision. Our court then held the Offset Provision was unconstitutionally vague and therefore was an unenforceable spending condition under *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1 (1981).

§ 802(c)(2)(a), could be read to bar the states from enacting *any* tax cuts—a key part of their sovereign taxing authority, *see, e.g.*, *Dep't of Revenue of Or. v. ACF Indus., Inc.*, 510 U.S. 332, 345 (1994) (noting that "the taxation authority of state government" is "an authority we have recognized as central to state sovereignty") (citing *Tully v. Griffin, Inc.*, 429 U.S. 68, 73 (1976); *Union Pac. R.R. Co. v. Peniston*, 85 U.S. 5, 29 (1873)).

How did the federal government infringe on state taxing authority, according to Tennessee? ARPA offered states billions of dollars to help address the public health and economic consequences of COVID-19, to help compensate essential workers, and for investments in water and broadband infrastructure. *See* 42 U.S.C. § 802(c)(1)(A)–(D). But the Offset Provision purportedly forbids the states from using ARPA funds

> to either directly or indirectly offset a reduction in the net tax revenue of such State or territory resulting from a change in law, regulation, or administrative interpretation during the covered period that reduces any tax (by providing for a reduction in a rate, a rebate, a deduction, a credit, or otherwise) or delays the imposition of any tax or tax increase.

*Id.* § 802(c)(2)(A). This directive "does not clearly explain (1) how to calculate a 'reduction' in net tax revenue, (2) how to determine whether such a reduction resulted from a tax cut, or (3) how to tell what particular conduct constitutes an 'indirect' offset." *Kentucky v. Yellen*, 54 F.4th 325, 347 (6th Cir. 2022). As a result, Tennessee argued (and we agreed) "that an 'indirect offset' could plausibly occur whenever a state enacts a revenue-reducing tax cut and expends ARPA funds—no matter whether the state pours the ARPA funds into the precise area it cut taxes." *Id.* at 348.

Under this "money-is-fungible interpretation of the Offset Provision," *id.* at 349, executive officials could use Congress's vague statutory language to control the taxation policy of any state that accepts ARPA funds. Indeed, that's what Treasury's Rule implementing the Offset Provision seems to say: "*because money is fungible*, even if [ARPA] funds are not explicitly or directly used to cover the costs of changes that reduce net tax revenue, those funds may be used in a manner inconsistent with the statute by indirectly being used to substitute for

---

Judge Nalbandian disagreed with the panel majority regarding whether Kentucky could proceed but otherwise agreed on all other aspects of the decision.

the state's or territory's funds that would otherwise have been needed to cover the costs of the reduction." 87 Fed. Reg. at 4,424 (emphasis added).

The dissental does not seem to dispute that, through use of Spending Clause legislation, Congress could control state tax policy in this way. And the ramifications of the dissental's reasoning are far-reaching. The dissental apparently would allow Congress to control large aspects of a state's sovereign power, so long as the state agreed to give up that authority by "contracting" with the federal government through acceptance of federal grant money.

Could a state, for a sum of money paid by the federal government, give up all of its powers of governance? Of course not. So what are the limits to a state's ability to sell its sovereign powers to the federal government? As even the dissental must acknowledge, there are limits: a spending condition on states is valid only "if the essence of their statehood is maintained without impairment." *Charles C. Steward Mach. Co. v. Davis*, 301 U.S. 548, 597 (1937).

For purposes of the appeal, we didn't need to decide when this impairment occurs in the context of states receiving federal grant money dispensed with conditions under the Spending Clause. Instead, the case turned on whether Congress clearly stated one such condition—the tax limitation that is embodied in the Offset Provision. For, as the Supreme Court has directed, "if Congress intends to impose a condition on the grant of federal moneys [under its Spending Clause authority], it must do so unambiguously." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) (citing *Emps. v. Dep't of Pub. Health & Welfare of Mo.*, 411 U.S. 279, 285 (1973)). This threshold requirement—that Congress speak clearly as to a condition it imposes—at least provides assurance that, before a state gives up some of its power in exchange for federal grant money, the state's eyes are wide open: it knows what the consequences are.

This requirement that Congress clearly state its conditions was applied in *Pennhurst* in the context of federal grant funds for services for people with mental disabilities. Attached to the grant money was a "bill of rights" that stated that (1) people with developmental disabilities "have a right to appropriate treatment" and (2) such treatment "should be provided in the setting that is least restrictive of the person's personal liberty." *Id.* at 13. The Court held that

"appropriate treatment" and "least restrictive" are indeterminate terms, so "Congress fell well short of providing clear notice to the [s]tates" of what the bill-of-rights provisions meant or that they were compulsory. *Id.* at 24–25.

A similar vagueness existed here in the Offset Provision. Indeed, Secretary Yellen acknowledged as much when she stated that "[w]e will have to define what it means to use money from this Act as an 'offset' for tax cuts. And, given the fungibility of money, it's a hard question to answer." Treasury Secretary & Federal Reserve Chair Testimony on COVID-19 Economic Recovery at 58:30-59:05, available at https://www.c-span.org/video/?510059-1/treasury-secretary-federalreserve-chair-testimony-covid-19-economic-recovery. Because it was "a hard question to answer"—that is, the meaning of the Offset Provision was vague—that condition is unenforceable under *Pennhurst*.

The dissental attempts to clarify the vagueness by asserting that the Offset Provision simply "prohibits a state from using the funding to help balance its books." Dissental at 10. That is one reading of the statute. But because of the lack of clear content, it is not obvious what the provision requires. Another possible reading—acknowledged by Treasury—is that the Offset Provision allows Congress to control *any* tax cut of a state, regardless of whether the tax cut is directly tied to the receipt of ARPA funds. The availability of other interpretations like this one, which would tie the hands of a state when it comes to cutting taxes, renders the Offset Provision unenforceable under the *Pennhurst* clear-statement rule.

The dissental contends that *Pennhurst* and its progeny apply "when the Treasury seeks to recoup funds from a state for an alleged violation of a *specific* condition attached to a grant of funds." Dissental at 13. But that was not exactly the situation in *Pennhurst* itself. In that case, the Supreme Court considered whether the "bill of rights" provision was a valid exercise of Congress's authority under the Constitution's Spending Clause—not whether a recoupment action was valid. 451 U.S. at 25.

The dissental also asserts: "No prior Spending Clause case has ever prospectively enjoined enforcement of an entire provision based on purported vagueness in the statute, meaning that the panel's analysis lacks a cognizable legal foundation." Dissental at 14. But

*Pennhurst* essentially did just that by nullifying the bill-of-rights provisions. Similarly, in *NFIB v. Sebelius*, 567 U.S. 519 (2012), the Supreme Court held that Congress could not use the spending power to force states to expand Medicaid. As Chief Justice Roberts explained,

> Section 1396c gives the Secretary of Health and Human Services the authority to . . . withhold all "further [Medicaid] payments . . . to the State" if she determines that the State is out of compliance with any Medicaid requirement, including those contained in the expansion. 42 U.S.C. § 1396c. In light of the Court's holding, the Secretary cannot apply § 1396c to withdraw existing Medicaid funds for failure to comply with the requirements set out in the expansion. That fully remedies the constitutional violation we have identified.

*Id.* at 586 (opinion of C.J. Roberts).[2] While *NFIB v. Sebelius* was decided on coercion and not vagueness grounds, the Court in that case nevertheless invalidated, on a pre-enforcement basis, new conditions purportedly required to retain Medicaid funds.

Other Supreme Court cases have approved prospective relief based on the *Pennhurst* clear-statement rule. Consider *Sossamon v. Texas*, 563 U.S. 277 (2011), a case about the Religious Land Use and Institutionalized Persons Act of 2000, Pub L. No. 106-274, 42 U.S.C. § 2000cc et seq., which authorized "appropriate relief against a government" for burdens on prisoners' religious exercise. 563 U.S. at 282. Noting that "[d]ual sovereignty is a defining feature of our Nation's constitutional blueprint," *id.* at 283, the Supreme Court held this relief provision ambiguous and forbade future damages suits against states under the statute as violative of sovereign immunity. *Id.* at 288. Similarly, in *Gonzaga University v. Doe*, 536 U.S. 273 (2002), the Supreme Court held that "federal funding provisions provide no basis for private enforcement by [42 U.S.C.] § 1983" absent a clear statement, thus barring future § 1983 actions under the Family Educational Rights and Privacy Act of 1974. *Id.* at 279–80.

The dissental presses that "[w]hatever vagueness exists in the Act is of no moment to our prospective inquiry today; at most, it may make recoupment actions for the government more difficult tomorrow." Dissental at 19. But the purpose of the *Pennhurst* rule is to provide clarity

---

[2]Although the *NFIB* opinion was fractured, a majority of the court believed the spending condition was unconstitutional. 567 U.S. at 689. Based on the narrowest possible holding under the *Marks* rule, *see Marks v. United States*, 430 U.S. 188 (1977), it is fair to say the court held that the spending condition was unenforceable against the states for the purpose of withdrawing existing Medicaid funds.

to states when Congress *passes* the law, not just when the Executive chooses to enforce it. The states are entitled to know clearly what conditions they must abide by when they take the grant money, not live with the uncertainty of how vague conditions will be enforced in the future. *See Pennhurst*, 451 U.S. at 25 ("Though Congress' power to legislate under the spending power is broad, it does not include surprising participating States with postacceptance or 'retroactive' conditions.").

The dissental further appears to question the panel's reliance on statutory interpretation, but such reasoning is not out of the ordinary in cases involving challenges based on the Spending Clause. Such cases usually follow a clear-statement rule as a matter of statutory interpretation— namely, that Congress must condition the states' receipt of federal funds "unambiguously." *South Dakota v. Dole*, 483 U.S. 203, 207 (1987) (quoting *Pennhurst*, 451 U.S. at 17); *see, e.g.*, *Sch. Dist. of City of Pontiac v. Sec'y of U.S. Dep't of Educ.*, 584 F.3d 253, 283–84 (6th Cir. 2009) (en banc) (Sutton, J., concurring) (describing the clear-statement rule as a "statutory limitation on Congress's spending power"). Consistent with these and other precedents, our court decided this case based on statutory interpretation rather than invalidating the condition as unconstitutional. However, had the court taken the latter approach, as did the Eleventh Circuit, that mode of reasoning would have changed little about the outcome of the case. *See West Virginia v. U.S. Dep't of Treasury*, 59 F.4th 1124, 1146 (11th Cir. 2023). Indeed, as the dissental recognizes in a footnote, the reasoning it advocates would create a circuit split with the Eleventh Circuit. Dissental at 19 n.4.

Lastly, the dissental suggests that if the vagueness is "severe enough," the entire statute should be void under contract principles. Dissental at 17. Although Spending Clause legislation is "much in the nature of a contract," *id.* at 7 (quoting *Barnes v. Gorman*, 536 U.S. 181, 186 (2002)), that hardly means that every contract principle should be imported into the interpretation of spending legislation that infringes on state sovereign interests. This view would be difficult to square with Supreme Court precedent. Returning to *Pennhurst*, the Supreme Court did not invalidate the entire statute by treating it as a "contract" but instead deemed only the portion of the statute containing the vague conditions to be unenforceable. 451 U.S. at 23–25. Our court here followed a similar course with respect to the vague Offset Provision.

As *Pennhurst* and other precedents recognize, more is at stake when Congressional spending legislation threatens state sovereign interests than is at issue in a run-of-the-mill private contract dispute. "In traditionally sensitive areas, such as legislation affecting the federal balance, the requirement of clear statement assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision." *United States v. Bass*, 404 U.S. 336, 349 (1971). And the idea that cursory statutory language could slice state taxing authority stabs at the heart of Hamilton's defense of the Constitution in The Federalist Nos. 32 and 34, where he insisted that the federal government would have no control over retained state taxing authority. These are among the reasons that, particularly in the context of taxing policy, Congress must speak with a clear voice when it imposes conditions on states for the receipt of federal funds—a principle from *Pennhurst* that our court faithfully implemented in this case.

---

**DISSENT**

---

GRIFFIN, Circuit Judge, dissenting.

The American Rescue Plan Act (ARPA) appropriated nearly two trillion dollars to help mitigate the COVID-19 pandemic and its economic impact. Two hundred billion dollars went to the states if they agreed to comply with the conditions imposed by the Act. Every state did so and accepted the funding.

Yet despite the largesse the Act bestowed, many states took issue with it. *See, e.g.*, *Arizona v. Yellen*, 34 F.4th 841, 847–48 (9th Cir. 2022) (collecting cases). Relevant here, Tennessee complained, not about the money, but about a particular condition attached to the receipt of those funds. Under the Act, a state must use the funds in several ways, all generally related to the COVID-19 pandemic—to respond to the "public health emergency," to assist "workers performing essential work," to bolster "government services," and to make "necessary investments" in infrastructure. 42 U.S.C. § 802(c)(1)(A)–(D).[1] The Act also explicitly prohibits a state from using the funding to help balance its books:

> A State . . . shall not use the funds provided under this section or transferred pursuant to section 803(c)(4) of this title *to either directly or indirectly offset a reduction in the net tax revenue* of such State . . . resulting from a change in law, regulation, or administrative interpretation during the covered period that reduces any tax (by providing for a reduction in a rate, a rebate, a deduction, a credit, or otherwise) or delays the imposition of any tax or tax increase.

*Id*. § 802(c)(2)(A) (emphasis added).

This "Offset Provision" drew Tennessee's ire. It sought to prospectively enjoin the Department of the Treasury from enforcing the Provision, claiming, among other things, that the

---

[1]A fifth permissible use of the funds was later added, allowing the states "to provide emergency relief from natural disasters or the negative economic impacts of natural disasters." 42 U.S.C. § 802(c)(1)(E).

Provision was an unconstitutionally ambiguous condition in violation of the Spending Clause.**[2]** *See, e.g.*, *South Dakota v. Dole*, 483 U.S. 203, 207, 211 (1987). The panel held that the Provision was vague because it failed to adequately explain: "(1) how to calculate a 'reduction' in net tax revenue, (2) how to determine whether such a reduction resulted from a tax cut, or (3) how to tell what particular conduct constitutes an 'indirect' offset." *Kentucky v. Yellen*, 54 F.4th 325, 347 (6th Cir. 2022). Yet while the panel explicitly declined to hold the Provision "'unconstitutional' under the Spending Clause, strictly speaking, just because of those indeterminacies," it still provided the requested injunctive relief. *Id*. It concluded that, "[a]s a matter of statutory interpretation," the provision was statutorily unenforceable and severable by operation of the Spending Clause's clear-statement rule. *Id*. This analysis, conclusion, and remedy is extraordinary, erroneous, and in conflict with Supreme Court precedent. *See* Fed. R. App. P. 35(a)(1).

This case also involves a question of exceptional importance. *See* Fed. R. App. P. 35(a)(2). It has significant, wide-reaching implications. Every state accepted ARPA funding and agreed to its conditions, so a correct interpretation of the Offset Provision is critical not only for the states in our circuit, but also on a national level. In addition, the panel's decision will significantly impair Congress's ability to impose conditions in future legislation. *Cf. Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 669 (1985) (noting that Congress need not "prospectively resolve every possible ambiguity" in Spending Clause legislation). This impacts Congress's relationship with the states and its ability to further its own policy objectives through Spending Clause legislation.

I therefore respectfully dissent from the denial of the petition for rehearing en banc.

---

**[2]**Kentucky joined Tennessee in bringing this suit, but Kentucky's claim, as with other states' parallel suits, foundered on jurisdictional issues based on the injuries (or lack thereof) alleged in the individual complaints. *Compare Kentucky v. Yellen*, 54 F.4th 325, 341 (6th Cir. 2022), *Ohio v. Yellen*, 53 F.4th 983, 985 (6th Cir. 2022), *and Missouri v. Yellen*, 39 F.4th 1063, 1070–71 (8th Cir. 2022), *with West Virginia v. U. S. Dep't of Treasury*, 59 F.4th 1124, 1138–40 (11th Cir. 2023), *and Arizona*, 34 F.4th at 853.

I.

Incident to the Spending Clause of the U.S. Constitution, "Congress may attach conditions on the receipt of federal funds, and has repeatedly employed the power to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives." *Dole*, 483 U.S. at 206 (internal quotation marks omitted); *see also* U.S. Const. art. I, § 8, cl. 1. These conditions and policy objectives may exceed the Constitution's "enumerated legislative fields" because "the power of Congress to authorize expenditure of public moneys for public purposes is not limited by the direct grants of legislative power found in the Constitution." *Dole*, 483 U.S. at 207 (citation omitted). With this, the Supreme Court has "repeatedly characterized" Spending Clause legislation as "much in the nature of a *contract*: in return for federal funds, the [states] agree to comply with federally imposed conditions." *Barnes v. Gorman*, 536 U.S. 181, 186 (2002) (citation omitted). States, as sovereigns, are therefore free to contract with Congress under the Spending Clause "if the essence of their statehood is maintained without impairment." *Charles C. Steward Mach. Co. v. Davis*, 301 U.S. 548, 597 (1937).

Yet Congress's power under the Spending Clause is not unlimited, for if Congress imposes a condition on the receipt of funds, it "must do so unambiguously," thereby enabling the states "to exercise their choice knowingly, cognizant of the consequences of their participation." *Dole*, 483 U.S. at 207 (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). The seminal case on unambiguity is *Pennhurst*. The dispute there was whether Pennsylvania was required to provide certain types of treatment to mentally disabled persons after it accepted funds under the Developmentally Disabled Assistance and Bill of Rights Act of 1975. 451 U.S. at 6–10. The plaintiffs alleged that the state violated its obligations under the so-called patient "bill of rights" provision of the act by not affording patients the right to "appropriate treatment" in the "least restrictive" setting. *Id.* But the Court held that this was not a condition on the receipt of funding and thus the state did not agree to it as a binding obligation when it accepted the funding. *Id.* at 27. In context, that provision merely "serve[d] as a nudge" in Congress's preferred direction and did "no more than express a congressional preference for certain kinds of treatment." *Id.* at 19 (citation omitted). Because the Provision "lack[ed]

conditional language," Congress intended it to be "hortatory, not mandatory," and "fell well short of providing clear notice to the States that they, by accepting funds under the Act, would indeed be obligated to comply with [it]." *Id.* at 24, 25.

*Pennhurst* thus established the contours of the clear-statement rule. This rule applies when the Treasury seeks to recoup funds from a state for an alleged violation of a *specific* condition attached to a grant of funds. When a state has allegedly violated a condition and we are called to determine whether that purported condition is, in fact, a condition on the receipt of funds, we look for a clear statement from Congress. This is a matter of "statutory construction." *Id.* at 24. We must determine whether Congress gave "clear notice" that it intended the alleged condition to be a binding obligation on the acceptance of funds. *Id.* at 25. If it did, the condition applies. But if *not*, the disputed provision is simply *not* a condition, and a state—like Pennsylvania in *Pennhurst*—need not comply with it. *See id.* at 25, 27.

Subsequent cases have not deviated from this analysis. For example, the Supreme Court in *Bennett* held that Kentucky had to comply with an "unambiguous" funding-calculation condition in Title I even if ambiguities existed in other applications of the statute—"*Pennhurst* does not suggest that . . . every improper expenditure [must be] specifically identified and proscribed in advance." 470 U.S. at 666, 673. In *Arlington Central School District Board of Education v. Murphy*, the Court concluded that compensation of expert fees was not an unambiguous condition in the Individuals with Disabilities Education Act: when viewing the Act "from the perspective of a state official" deciding whether to accept the funds, the act did not clearly express that the "liability at issue" (i.e., expert fees) was a condition on the receipt of funding. 548 U.S. 291, 296–98 (2006). And our court has followed the same framework. Though we divided as to application, the entire en banc court applied this statutory interpretation principle in *School District of City of Pontiac v. Secretary of the United States Department of Education*, 584 F.3d 253 (6th Cir. 2009) (en banc), when determining whether the "unfunded mandate" in the No Child Left Behind Act required a state to comply with the act, even if doing so increased the costs of compliance. *See id.* at 271–72 (opinion of Cole, J.); *id.* at 284–85 (Sutton, J., concurring); *id.* at 310–11 (Gibbons, J., concurring in part). *See also Cutter v. Wilkinson*, 423 F.3d 579, 585–86 (6th Cir. 2005) ("The plain language of RLUIPA provides

ample notice to potential funding recipients" that the statute applies to "any program or activity that receives Federal financial assistance." (citation omitted)).  In each of these cases, the state was accused of violating a Congressional requirement attached to funding.  Then, to evaluate each claim, each court was tasked with determining whether the specific "liability at issue" was clearly articulated and unambiguous such as to require the state to comply with the condition.  *Cf. Arlington*, 548 U.S. at 296.

The panel's decision to use the clear-notice standard in such a novel manner conflicts with this caselaw.  The Treasury has not claimed that Tennessee violated the Offset Provision; rather, Tennessee prospectively challenges the provision's ambiguity and asks us to enjoin its future enforcement.  *Pennhurst*'s clear-statement rule nowhere near encompasses this situation.  Thus, it is inapplicable here, for "a decision based on a certain set of facts should not control the outcome of a later case with a factual context that the court adjudicating the earlier case had no opportunity to consider."  *See* Bryan A. Garner, *et al.*, *The Law of Judicial Precedent* 82 (2016).  By applying the "clear notice" language in an unprecedented manner, wholly unsupported by prior caselaw, the panel "cherry-pick[ed] a sentence" from *Pennhurst* to divine a rule that "has no precedential force" in this analysis.  *Id.*; *see also In re Flint Water Cases*, 53 F.4th 176, 207 (6th Cir. 2022) (opinion of Griffin, J.) ("To derive a rule from a case that did not address the pertinent question is to build a syllogism upon a conjecture." (citation and internal quotation marks omitted)).  No prior Spending Clause case has ever prospectively enjoined enforcement of an entire provision based on purported vagueness in the statute, meaning that the panel's analysis lacks a cognizable legal foundation.

The decision also creates intractable tension with other areas of law.  Despite recognizing that the Offset Provision is not "unconstitutional" because of its purported vagueness, the panel still enjoined enforcement of the provision "[a]s a matter of statutory interpretation."  *Kentucky*, 54 F.4th at 347.  But a party is entitled to a permanent injunction like this only "if it can establish that it suffered a *constitutional* violation . . . ."  *Schmitt v. LaRose*, 933 F.3d 628, 637 (6th Cir. 2019) (citation omitted; emphasis added).  Statutory interpretation, by contrast, does not give a court this authority.  Rather, "[i]n the interpretation of statutes, the function of the courts is easily stated.  It is to construe the language so as to give effect to the intent of Congress."  *United States*

*v. Am. Trucking Ass'ns*, 310 U.S. 534, 542 (1940).  Thus, Tennessee could be entitled to a facial injunction if it could demonstrate that ARPA were unconstitutional, but such a challenge would face a high bar—we presume statutes to be constitutional and require litigants to establish that no set of circumstances exist under which the statute is valid.  *See United States v. Morrison*, 529 U.S. 598, 607 (2000); *United States v. Salerno*, 481 U.S. 739, 745 (1987).  The panel's opinion thus recasts a constitutional analysis as a statutory one, allowing it to provide a constitutional *remedy* (injunctive relief) while avoiding the high hurdles of a constitutional *analysis*.  But this it could not do, for "[e]ven though this clear-statement rule has constitutional roots, it remains a rule of *statutory* interpretation, one constrained by other canons of statutory interpretation."  *City of Pontiac*, 584 F.3d at 284 (Sutton, J, concurring); *accord id*. at 271–73 (Cole, J.).  No authority allows a court to enjoin enforcement of a statute under the Spending Clause simply because it is vague "as a matter of statutory interpretation."

To resolve Tennessee's ambiguity argument, we should instead apply traditional contract law principles.  As noted above, the Supreme Court has "repeatedly characterized Spending Clause legislation as 'much in the nature of a *contract*'" and "regularly applied the contract-law analogy in cases defining the scope of conduct for which funding recipients may be held liable for money damages."  *Barnes*, 536 U.S. at 186 (quoting *Pennhurst*, 451 U.S. at 17).  "Just as a valid contract requires offer and acceptance of its terms," Spending Clause legislation "rests on whether the [state] voluntarily and knowingly accepts the terms of the 'contract.'"  *Id*. (citation omitted).  The "crucial inquiry" is "whether Congress spoke so clearly that we can fairly say that the State could make an informed choice."  *Pennhurst*, 451 U.S. at 25.  These principles apply here, as Tennessee complains of an "unconstitutionally ambiguous" condition attached to an offer of funding (with which it agreed to comply).[3]

Through this lens, ARPA is a valid exercise of Congress's Spending Clause power at this juncture.  A valid contract requires "reasonably certain" terms—ones that "provide a basis for

---

[3]While *Barnes* did note that not "*all* contract-law rules apply to Spending Clause legislation," that is no barrier here.  536 U.S. at 186.  That was a reference to *Bennett*'s conclusion that "ambiguities in the requirements should [not] invariably be resolved against the Federal Government as the drafter of the grant agreement."  470 U.S. at 669.  Therefore, this admonition from *Barnes* merely makes clear that we should not automatically hold any ambiguity here against the government.

determining the existence of a breach and for giving an appropriate remedy." Restatement (Second) of Contracts § 33 (Am. L. Inst. 1981). And the terms of Congress's offer are indeed reasonably certain. For one, states know that the Offset Provision is one of the "[r]equirements" on the use of funds, § 802(c), so the Act does not "lack conditional language," *Pennhurst*, 451 U.S. at 25. A state also knows that it must "use" the money only in the ways enumerated by the Act: by providing (1) assistance or aid to industries affected by the pandemic; (2) pay or grants to essential workers; (3) "government services" in those areas where funding was impacted by the pandemic; (4) "necessary investments" in infrastructure, or (5) "emergency relief from natural disasters." 42 U.S.C. § 802(c)(1). Conversely, the Offset Provision itself conveys that the states *cannot* "use" the money to balance the books by offsetting a tax reduction. *Id*. § 802(c)(2)(A). Together, these conditions convey that a state must use the money in certain ways to provide direct assistance, while clarifying that offsetting tax breaks is not a permitted use of ARPA funds.

That some vagueness may exist in the Offset Provision itself does not change that a state can reasonably understand its obligations. First, § 802(g)(1) reasonably conveys the baseline year—states should know that this is 2019, the last full fiscal year before the "covered period" outlined by ARPA and before the beginning of the COVID-19 pandemic. Second, the statute provides a mechanism for determining whether a state's tax revenues are "reduce[d]"—the Secretary of the Treasury is empowered to provide "necessary or appropriate" guidance to carry out the section under § 802(f). States would reasonably know that that guidance would fill in the missing pieces, including whether the Offset Provision applies to expected or actual tax revenues. And courts have deferred to an agency's explicit authority to implement Spending Clause legislation. *See Bennett*, 470 U.S. at 668–73; *Mowbray v. Kozlowski*, 914 F.2d 593, 600–01 (4th Cir. 1990) ("[A]mbiguit[ies] in the Medicaid scheme . . . require some deference to [the Secretary of Health's] interpretation."). Third, the term "indirectly offset" is not so broad as to deprive a state of the ability to understand its obligations. The directives in § 802(c)(1) convey how a state must use ARPA money, and the Offset Provision clarifies that tax cuts are not a mode of "assistance" that states can provide. Read in context with § 802(c)(1), if Tennessee uses ARPA funds in compliance with the enumerated "use" requirements, it will comply with ARPA's conditions, even if it enacts other tax cuts. Whether § 802(c)(2)(A) conveys the precise

contours of "indirectly offset" is immaterial here, for no interpretation of the Offset Provision can override or conflict with the provisions of § 802(c)(1). *See Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("[W]ords of a statute must be read in their context and with a view to their place in the overall statutory scheme."(citation omitted)); A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 180 (2012) ("The provisions of a text should be interpreted in a way that renders them compatible, not contradictory."). For this reason, it is unambiguously clear that the phrase does *not* rise to the level of prohibiting *all* tax cuts, meaning that the Act does not abridge a state's "indispensable" and "essential" power of taxation. *See Lane Cnty. v. State of Oregon*, 74 U.S. 71, 76–77 (1868). So the agreement is valid because "the essence of their statehood is maintained without impairment." *Steward Mach. Co.*, 301 U.S. at 597. In sum, as long as a state complies with § 802(c)(1), it knows it is not performing an indirect offset and that the government cannot recoup the spent funds.

The panel's decision to ignore these contract-law principles is particularly problematic here. For one, in contract law, an ambiguous or vague term *never* leads to invalidation of only one part of a contract. If the vagueness is severe enough, there is no meeting of the minds and the agreement *itself* is void: "If the essential terms are so uncertain that there is no basis for deciding whether the agreement has been kept or broken, there is no contract." Restatement (Second) of Contracts § 33, comment *a*. But if the agreement stands, a court will interpret it and provide the requisite clarity. "When parties agree to a patently ambiguous term, they submit to have any dispute over it resolved by interpretation. That is what courts and arbitrators are *for* in contract cases—to resolve interpretive questions founded on ambiguity." *Colfax Envelope Corp. v. Local No. 458-3M, Chi. Graphic Commc'ns Int'l Union AFL-CIO*, 20 F.3d 750, 754 (7th Cir. 1994). In *no* instance will a court determine that a contract exists but that one provision is categorically unenforceable simply because its scope may be initially unclear. *Cf. Texas v. New Mexico*, 482 U.S. 124, 129 (1987) ("[G]ood-faith differences about the scope of contractual undertakings do not relieve either party from performance."). If the Provision's terms were indeed vague, Tennessee and the Treasury did not contract, the entire contract is void, and Tennessee must return the funding. Conspicuously (and unsurprisingly), Tennessee has never volunteered to do so.

Further, this conclusion causes particular discord in the Spending Clause context as Congress must now speak with greater clarity than courts have ever required. Congress does not need to "prospectively resolve every possible ambiguity" or identify "every improper expenditure" when offering funds to states. *Bennett*, 470 U.S. at 666, 669; *see also Pennhurst*, 451 U.S. at 24–25 (noting that a condition is valid if "Congress spoke so clearly that we can fairly say that the State could make an informed choice," even if a state's potential obligations may otherwise be "largely indeterminate"). Requiring it to do so would have a chilling effect on Congress's ability to impose discretionary conditions, even though courts have held that those pass Spending Clause muster. *See, e.g.*, *Penn., Dep't of Pub. Welfare v. Sebelius*, 674 F.3d 139, 153 (3rd Cir. 2012) (noting that a "discretionary" condition does not defy *Pennhurst*, which "merely requires that states have clear notice of conditions on accepting federal funds, and imposes no requirement that such conditions be unconditional"). And requiring this much specificity will likely prove to be unworkable. *See Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002) ("Congress is not required to list every factual instance in which a state will fail to comply with a condition. Such specificity would prove too onerous, and perhaps, impossible.").

Moreover, the panel's decision wrongly allows the states to receive ARPA funds but escape their agreement with Congress to comply with the Offset Provision—to essentially have their cake and eat it too. Every state agreed to accept ARPA funding on the condition that it would not use the money to offset tax breaks. Allowing states to renege on this agreement not only contravenes the Spending Clause and basic contract law, but it also goes against principles of equity and fairness. And allowing states to do this harms the public—rather than use ARPA funds only for the public benefits outlined in § 802(c)(1), states may keep some funding to balance their own books.

Finally, Tennessee had the option to accept or decline ARPA's conditional funding, and we should honor its decision to take the money, conditions and all. If indeed it was concerned about the Offset Provision and did not want to comply with it, Tennessee could have, and should have, said no to the federal government's offer of assistance. Turning down Congress's substantial funding offer may have been a difficult one, but doing so would have been a

legitimate way for Tennessee to defend its sovereign prerogatives.  In this circumstance, Chief Justice Roberts's words are particularly poignant:

> In the typical case we look to the States to defend their prerogatives by adopting "the simple expedient of not yielding" to federal blandishments when they do not want to embrace the federal policies as their own.  The States are separate and independent sovereigns.  Sometimes they have to act like it.

*National Federation of Independent Business v. Sebelius*, 567 U.S. 519, 579 (2012) (opinion of Roberts, C.J.) (quoting *Massachusetts v. Mellon*, 262 U.S. 447, 482 (1923)).

In sum, ARPA's offer of funding passes muster at this juncture.  The terms of Congress's offer were certain enough to create a contract, permitting Tennessee to make its choice knowingly and voluntarily.  *Pennhurst*, 451 U.S. at 17.  The panel's use of the clear-statement rule to enjoin the Offset Provision contravenes fundamental tenets of the Spending Clause analysis.[4]  Whatever vagueness exists in the Act is of no moment to our prospective inquiry today; at most, it may make recoupment actions for the government more difficult tomorrow.

## II.

For these reasons, I respectfully dissent and would grant the government's petition for rehearing en banc.

ENTERED BY ORDER OF THE COURT

Deborah S. Hunt, Clerk

---

[4]I acknowledge that the Eleventh Circuit subsequently held the Offset Provision to be unconstitutional. *West Virginia*, 59 F.4th at 1146.  But that case is of little support to the panel decision here—while it reached the same basic result as the panel, it enjoined the Offset Provision as unconstitutional, not as a matter of statutory interpretation.  That conclusion departs from all established precedent that the clear-statement rule is a matter of *statutory* interpretation that does not allow such an injunction.  *See Pennhurst*, 451 U.S. at 24–25; *accord City of Pontiac*, 584 F.3d at 284 (Sutton, J., concurring); *Sandoval v. Hagan*, 197 F.3d 484, 495 (11th Cir. 1999), *rev'd on other grounds, Alexander v. Sandoval*, 532 U.S. 275 (2001).  Consequently, that opinion suffers from similar downfalls to those described here.